## JAMES SCOTT *et a. vs.* NAHUM WILLSON.

3 | 321
69 | 29
169 | 31
69 | 32

Under the act regulating the mode of putting pine timber into Connecticut river, timber sent down the stream, without being rafted, and without being under the immediate care and control of some person, is forfeited, if found lodged upon an island in the river.

When timber is forfeited under the said act, the title of the former owner is wholly lost; and a contract with the person, who has taken up the timber, to come and pay him for his trouble, and take away the timber, does not revest the title, until the contract is executed.

The said act is not repugnant to the constitution, nor to the laws of the United States, nor to the constitution of this state.

All rivers are, by the common law, deemed navigable waters, as far as the tide ebbs and flows; and waters not navigable, in the common law sense of the term, may, by usage, become public highways.

TROVER for pine timber. The cause was tried here, upon the general issue, at May term, 1824; when it appeared in evidence, that the plaintiffs, being inhabitants of the state of Vermont, and having taken a large quantity of pine timber from land in that state, put the same into Connecticut river, upon the fifteen miles falls, so called, several miles above where it could have been rafted; for the purpose of carrying the same timber, upon the river, through this state to Massachusetts.

It also appeared, that one *Barker*, having found the timber, mentioned in the declaration of the plaintiffs, part lodged upon islands, and part floating, in said river, more than sixty miles below the said falls, where timber may be conveniently rafted, seized the same, as forfeited, under the statute of June 10, 1808, and sold it to the defendant. The timber, thus seized by *Barker*, was part of the timber put into the river, as aforesaid, by the plaintiffs, and had never been rafted.

It further appeared, that, after the seizure of the timber by *Barker*, an agreement was made between him and the plaintiffs, that he should keep the timber until a rise in the waters of the river should happen, that might enable the plaintiffs to float the timber away; and that they should then take the timber, and pay him for his trouble in securing it. But it appearing, that the plaintiffs suffered a rise in the waters of the river to pass, without calling for the timber, and paying according to the said agreement; the court ruled, that this contract did not revest the property of the timber in the plaintiffs, so as to enable them to maintain this action.

And the jury having returned a verdict in favor of the defendant, the plaintiffs moved the court to grant a new trial ;

1. Because the said statute of June 10, 1808, was repugnant to the constitution, and laws of the United States, and void, and so could give to the defendant no title to the said timber.

2. Because the timber, found by *Barker* upon the islands in the river, was not forfeited by the said statute.

3. Because, if the said timber had been forfeited, the title was revested in the plaintiffs by the contract made between them and *Barker.*

*Goodall* and *Woodbury*, for the plaintiffs.

*J. C. Chamberlain* and *Bell*, for the defendant.

RICHARDSON, C. J. delivered the opinion of the court.

The statute, entitled " an act regulating the mode of putting pine timber into Connecticut river," enacts, " that " from and after the first day of November, 1809, all pine " timber found floating in said Connecticut river, without " being rafted, or under the immediate care and control of " some person or persons, and also all pine timber, which, " by being put into said river without being rafted, or under " such control, shall be found on the banks or meadows ad- " joining said river, shall and hereby is forfeited to any per- " son, who will take up the same." 1 *N. H. Laws* 399.

It is made a question in this case, whether pine timber, found upon an island in the river, is within the intent of the above clause in the statute ; and as a portion of the timber, which the plaintiffs claim, was seized upon an island, if this objection is well founded, it is clear, that the defence, on which the defendant relies, is not an answer to the plaintiff's whole claim, and there must be a new trial.

The statute declares, that pine timber found, under certain circumstances, " on the banks or meadows adjoining said " river," shall be forfeited. The word bank means an elevation of earth ; and the word meadow, with us, means among other things low ground adjacent to streams. Both these may be found upon islands, as well as anywhere else ; and we have not been able to entertain a doubt, that the legislature intended, by these terms, all the land, which the

stream at any time covers, and where timber floating down the river may be left by the water. No reason can be conjectured, why the legislature should declare timber forfeited, when found floating in the stream, or left upon other banks, and yet have exempted it from forfeiture, when found upon the bank of an island in the river. It is exceedingly clear, that the object of passing the act was to prevent the putting of timber into the river to float down at random.— The motives, which induced the legislature to pass the act, are explicitly stated in the preamble, which declares, that " the present mode of putting pine timber into Connecticut " river, and letting it float at random down the same, does " great injury to the mills, bridges, and other works on said " river, and is a great damage to the intervals and mead- " ows, by lodging thereon, and also by carrying away the " banks of said river ; and besides is rapidly wasting and " destroying said timber, but is more particularly dis- " couraging to, and almost wholly prevents the manufacture " thereof in our own country." Such being the object of the act, and such the motives, in which it originated, it seems to us wholly incredible, that the legislature could have intended to exempt timber, which had been put into the river against the spirit of the law, from forfeiture, merely because it happened to be left by the water on an island. We have therefore no hesitation in overruling this objection.

Another ground, on which the plaintiffs contend, that they are entitled to a new trial, is, that the jury were misdirected with regard to the legal effect of the contract between the plaintiffs and *Barker*. In examining the point, we must now, after a verdict is in favor of the defendant, take it for granted, that, at the time that contract was made, the timber had been forfeited ; and that by the forfeiture the plaintiffs had lost all their interest in it, is too clear to be disputed. 11 *John.* 293.—14 *ditto* 128.—3 *Cranch* 337.—5 *D. & E.* 112.— 7 *ditto* 171.

If then the plaintiffs had any title to the timber, after the forfeiture, it must have been acquired by purchase. But the contract between them and *Barker* was not an executed, but an executory contract. It was not a sale, but an agree-

ment to sell, upon certain conditions. If they came for the timber and paid for it, within a certain time, they were to have it. But they did not come ; they did not pay. There was then an end of the contract. There is no pretence, that they could acquire any interest in the timber, by such a contract, until it was executed.

It has been further urged, in behalf of the plaintiffs, that the statute, under which this timber was seized by *Barker*, is repugnant to the constitution and laws of the United States. If this objection be well founded, the title of the defendant fails ; and the plaintiffs will be entitled to a new trial.

Before we proceed to examine the merits of this objection, it may be useful to ascertain the character of the waters, to which our statute relates.

All rivers, where the tide ebbs and flows, are by the common law denominated navigable waters ; and the use of them belongs of common right to every citizen. *Willes's Rep.* 265, *Ward vs. Creswell.—Bracton* 8.—6 *Mod. Rep.* 73. —1 *Salk.* 357.—2 *Mass. Rep.* 492.—1 *Mod. Rep.* 105.—2 *B. & P.* 472.—*Cooper's Justinian* 455.—4 *Burr.* 2164.—2 *Binney* 475.—*Com. Dig.* "*Navigation*" *B. & Prærogative D.* 50.—10 *Mass. Rep.* 70.—4 *ditto* 140, 522.

All lands, bounded upon navigable waters, extend only to low water mark. ( 5 *Coke* 106, *Constable's case.—Moor* 121, *Lacy's case.*) And he, who claims any private right in these waters, must shew it by grant or by prescription. 1 *Mod.* 105.—4 *Burr.* 2164.

The Roman jurists seem to have supposed, that the use of the banks of navigable rivers was public by the law of nations. " *Riparum quoque usus publicus est jure gentium, sicut* " *ipsius fluminis.*" *Jus. In. Lib.* 2, *tit.* 1, *sec.* 4. The same opinion formerly prevailed in England ; and *Bracton* copied into his treatise the section of *Justinian de usu et proprietate riparum,* almost literally. And since *Bracton's* time, some English judges have been inclined to adopt the same principle. 1 *Ld. Ray.* 726.—6 *Mod.* 163. But in the case of *Bull vs. Herbert,* (3 *D. & E.* 253,) it was solemnly determined, that the public were not entitled, at common law, to tow on the banks of ancient navigable rivers.

The common law considers all rivers, where the tide does not ebb and flow, as inland rivers, not navigable, and as belonging to the owners of the adjacent soil.  *Davies' Rep.* 152. —4 *Burr.* 2162.—12 *Mod. Rep.* 510.

But rivers not navigable, in the common law sense of the term, may, by usage, become public highways.  10 *John.* 236, *Shaw vs. Crawford.*—3 *Caines' Rep.* 307, *Palmer vs. Muligan.*—17 *John.* 195, *The People vs. Platt.*

Connecticut river cannot, by the rules of the common law, be considered as navigable in this state, being above the ebb and flow of the sea ; but it has been so long used by the public, for the purpose of boating and rafting, that it must now, without question, be considered as a public highway.

It is contended, that the statute, now under consideration, is repugnant to that clause in the constitution of the United States, which declares, that Congress shall have power " to " regulate commerce with foreign nations, and among the " several states, and with the Indian tribes."

That clause in the constitution has lately been under the consideration of the supreme court of the United States, in the case of *Gibbon vs. Ogden* ; in which it was decided,

1. That a power to regulate commerce among the several states was a power to regulate navigation, within the limits of every state in the union.

2. That the statute of the United States, on the subject of the coasting trade, gave an authority to licensed vessels to carry on the coasting trade.

3. That a vessel propelled by steam might be licensed under that statute.

4. And that a law of a state, restraining a licensed vessel, propelled by steam, from navigating waters and entering ports, which are free to licensed vessels, was repugnant to said statute of the United States, and void.

As Congress has never passed any act to regulate the floating of timber upon rivers, this decision has no direct bearing upon the question, which this case presents for our decision. But it was contended, in that case, that as to regulate implied, in its nature, full power over the thing to be regulated, it excluded necessarily the action of all others, that

would perform the same operation on the same thing ; that regulation was designed for the entire result, applying to those parts, which remained as they were, as well as to those that were altered ; that it produced a uniform whole, which was as much disturbed and deranged by changing what the regulating power designed to leave untouched, as that on which it has operated. To this, the chief justice says, " There is great force in this argument, and the court is not " satisfied, that it has been refuted."

This remark of the chief justice seems to indicate, that, in the opinion of that court, the states have no authority to interfere in the regulation of the commerce among the several states. And this clause in the constitution of the United States seems to us so clearly to give to Congress the exclusive power to regulate commerce among the states, that, until the supreme court of the nation shall decide otherwise, we shall be disposed to consider that as its true intent and meaning.

The question then is, whether the statute of this state, which we are now considering, can be viewed as an attempt to regulate commerce ?

Nothing could, in all probability, have been further from the apprehension of our legislature, than that this statute could be deemed a regulation of commerce between two or more states. There is nothing in the provisions of the act, that has the appearance of such regulation. It requires a considerable effort of the imagination to give it any color of that sort. The only pretence, that it can be viewed in that light, is, that it acts upon an article of commerce, while passing through or from this state. But if every law, that has such an operation, is to be deemed a regulation of commerce, it would make wild havoc in the legislation of every state in the union.

Our act, authorizing the attachment of goods upon mesne process, may act, and frequently does act, upon articles of commerce between this and other states. But is it on this account to be deemed a regulation of commerce ? But it may be said, that this last mentioned act does not particular-

ly apply to articles of commerce between states. Nor does the act in relation to the floating of timber upon Connecticut river. Timber put into the river to be floated from one part of this state to another is as clearly liable to forfeiture, under the act, as timber put into the stream to be floated to Massachusetts or Connecticut.

The statutes, of this state and of Massachusetts, creating corporations for the purpose of making canals and locks, connected with the waters of Merrimack and Connecticut rivers, and also many statutes, creating corporations for the purpose of making turnpikes and bridges, act upon the commerce between the two states ; yet it is believed, that no one ever suspected, that those statutes could be deemed regulations of commerce, within the meaning of this clause in the constitution of the United States. So inspection laws may act upon commerce. But we have the authority of the highest court in the nation for saying, that they are not regulations of commerce. *C. J. Marshall*, in the case of *Gibbon vs. Ogden*, says, " that inspection laws may have a remote " and considerable influence on commerce, will not be de- " nied, but that a power to regulate commerce is the source, " from which the right to pass them is derived, cannot be " admitted. The object of inspection laws is to improve the " quantity of articles produced by the labor of a country, to " fit them for exportation, or, it may be, for domestic use. " They act upon the subject before it becomes an article of " foreign commerce, or of commerce among the states, and " prepare it for that purpose. They form a portion of that " immense mass of legislation, which embraces every thing " within the territory of a state, not surrendered to the gen- " eral government ; all which can be most advantageously " exercised by the states themselves. Inspection laws, " quarantine laws, health laws of every description, as well " as laws for regulating the internal commerce of a state, " and those, which respect turnpike roads, ferries, &c. are " component parts of this mass."

To regulate commerce among the states, is to prescribe the rules, by which the commerce among the states shall

Scott et a.
*vs.*
Willson.

be governed. The act under consideration, at this time, prescribes no rule, by which the commerce, between any two states is to be governed. Its object was to prevent the damage, which resulted to individuals from floating timber down the river in a particular manner, and not to regulate the intercourse between states or individuals. We are therefore of opinion, that this objection cannot prevail.

It is further objected, in this case, that the statute in question is repugnant to the constitution of this state ; because it does not embrace all rivers, but is confined to Connecticut river. It has been decided, in Massachusetts, that an act attempting to suspend the operation of a general law, in relation to a particular person, was unconstitutional. 11 *Mass. Rep.* 396, *Holden vs. James.* But that decision has no bearing upon the question to be decided in this case. Here the objection is not, that the law does not extend to all persons, but that it does not extend to all places. The objection in truth is, that the statute is a general law in relation to a particular place. But we have been referred to no clause in our constitution, which restrains the legislature from passing such a law ; nor have our researches enabled us to find any such clause. It is, therefore, the opinion of the court, that this objection must be overruled ; and that there be

*Judgment on the verdict.*