# BELKNAP,

## DECEMBER TERM, A. D. 1843.

---

## THE STATE *vs.* GILMANTON.

14 467
66 3

Upon the trial of an indictment against a town for not repairing a highway, it is too late to except to the report of the committee laying out the road, that it varies from the route mentioned in the petition.

It is a question of fact whether the road described in the indictment be the road laid out by the report; and if it be not sufficiently clear by a comparison of the descriptions, the matter should be submitted to the jury.

But if it appear clearly upon inspection of the report that the road described in the indictment is the road laid out, it is unnecessary to submit the question of the identity of the roads formally to the jury, and it will be sufficient if the court instruct them that they may consider the judgment of the court accepting the report, as establishing a road in the place mentioned in the indictment.

If a town make a road, intended as a substitute for one established by the court, and varying from it, and if the substitute be of public utility, is the town bound to keep it in repair, *quære?*

Whether a town could defend against an indictment, by showing that they had made a road, intended as a substitute for the road established by the court, but varying from it, *quære?*

In general, if in a body of water there be a steady and uniform current, it will be a river.

But this definition must be taken in connection with the particular body of water to which it relates, and is not applicable to a lake, in which there may be a uniform current from its head to its outlet.

A body of water lying below the outlet of a lake, through which the waters from the lake pass, and in which there is a steady and uniform current, is a river, although another appellation may have been usually given to it.

Evidence was offered that a river was from five to twenty-seven feet deep at the place where it was crossed by a bridge, and that it was navigable by rafts, but it did not appear that the river had ever been used for the purposes of commerce, nor that the bridge would impede the use of the river for boats or rafts.—

*Held,* that the maintenance of the bridge was not in violation of *ch.* 49, *sec.* 10, of the revised statutes, which prohibits the construction of a bridge so as to impede navigation.

INDICTMENT, for not keeping a road in repair.

It appeared in evidence that prior to the year 1834, a bridge, 37 rods long, was built by private subscription, connecting the towns of Gilmanton and Sanbornton, across the waters which lie below Meredith Bridge, between that and Union Bridge, and which are formed by the river running from Winnipiseogee lake into said waters, and by other smaller streams from other directions. The water where the bridge stands is from five to twenty-seven feet deep. ·

In the year 1834, a report from a committee appointed by the court of common pleas was accepted, purporting to lay out a road, of which the following is the description : " Beginning at a white oak tree standing in the fence on the westerly side of the new road in said Gilmanton, about eight rods south of the south-easterly corner of land owned by the heirs of Thomas Ladd, deceased ; thence south 58° west ninety-six rods, to a large pine tree ; thence south 64° west thirty-five rods, to a stake and stones ; thence west 24° north six rods, to land of Josiah C. Philbrook ; said one hundred thirty- · seven rods being over land of said John Ladd ; thence on the same course over land of said Philbrook to the north-easterly corner of the bridge ; thence north 27° west over said bridge, to a notch on a pine log ; thence west 11° south over land of Alpheus C. Philbrook, forty rods ; thence west 28° south ten rods, to the range way ; thence on the range way twelve rods, to land of Joseph H. Hill ; thence on said Hill's land, forty-six rods ; thence on said Hill's land, south 28° west fifty-two rods, to the road leading from Union Bridge to the Bay meeting-house in said Sanbornton ; and the line and monuments herein described are the westerly side of said highway, which we lay out three rods wide."

In the indictment, the road indicted is described as follows, to wit : " Beginning at the centre of the new bridge

across Sanbornton Bay ; thence running north-easterly to the highway leading from Union Bridge through said town of Gilmanton to Meredith Bridge, and being three rods in width and one half a mile in length."

The defendant contended that the state had failed to show a road legally established where the indictment charged; that the only evidence adduced was the report ; and if that established any road which the town of Gilmanton was liable to maintain, it was at the right hand of the bridge, and not where the indictment charged ; and that the variance between the report and indictment was a question of fact for the jury to investigate and pass upon ; but the court instructed the jury that the report was sufficient, and that for the purposes of this trial they might consider the judgment of the court accepting the report, as establishing a road where the indictment charged.

There was also evidence that the defendant had built a road leading to the bridge, but had gone no farther ; but it did not appear that the road built was upon the ground described in the indictment or report. The road was built since 1834. The court charged the jury that if said road was intended as a substitute for that described in the report, though it might vary somewhat from it, as it was travelled over by the public and was of public utility, the defendant was bound to maintain it in repair.

The defendant also excepted to the report as evidence, on account of certain alleged variances between the petition and report, but the court ruled that it was too late now to take the exceptions after the report had been accepted by the court.

If the road was legally established, as charged in the indictment, the ground on which the defendant denied its liability to keep the bridge in repair was, that the water over which it was built was not a river, and numerous witnesses were called on either side to prove that there was or was not a current in the water, and if a current, what was its nature,

and upon what it depended. Evidence was also adduced on either side as to the appellations that had been given to the waters heretofore, consisting of the charters of the towns bounded upon the waters, the petition for the laying out of the road describing the waters as Sanbornton Bay, grants of the Legislature, conveyances by individuals, and testimony that the waters had or had not been called a "river," or a "bay;" and the defendant contended that all the facts connected with the matter should be taken into consideration by the jury in coming to the conclusion whether the waters were a "river," or a "bay;" but the court instructed the jury that under the instructions of the court, the point for them to settle was, whether there was a current or not ; and if they should find that there was a regular, steady and perceptible current, however small, it mattered not what was the width of the water, or what it had been called, it was a river, and the defendant was liable to maintain the bridge.

The defendant requested the court to instruct the jury that inasmuch as the waters were navigable, the towns were bounded by the shore, and not the centre of the waters, whether they should be found to be a river or a bay ; but as there was no evidence that the waters were navigable by any thing but rafts, the court declined so to instruct the jury.

The jury found the defendant guilty, and the defendant moved the court to set aside the verdict, and for a new trial on account of the instructions as aforesaid.

*I. A. Eastman,* for the defendant.

1st. The court erred in taking from the jury a question of fact, which it was peculiarly their province to pass upon, and that was, whether *any* road was legally established in the *place* where the indictment charged.

To establish the road, the *only* evidence adduced on the part of the state was a report, purporting to lay out a road ; and from an inspection of the case, it will readily be per-

ceived that there is no similarity whatever between the description of the road given in the report and that given in the indictment. This report was made in 1834, and the indictment found in 1835. The state relied solely upon the report to create a liability on the part of the town. There was no pretence that a road had been established in any other way. The jury went upon the ground and examined the monuments alleged to be set forth in the report, and also those purporting to be given in the indictment; and the court should have left it for them to say whether they were one and the same road. It would certainly seem to be a question particularly belonging to the jury to decide, whether the road described in the report was indicted or not. If a different doctrine is to prevail, the report of a road laid out in one part of a town may be given in evidence to prove the establishment of one indicted in another part, even though they be ten miles apart. It is believed that the *location* of lands conveyed and roads laid out, has always been regarded a matter of fact for the jury.

2d. The case finds " that the defendants had built a road leading to the bridge, but had gone no farther; but it did not appear that the road built was upon the ground described in the indictment or report. The road was built since 1834." The court charged the jury that if this road was intended as a substitute for the one described in the report, the defendants were bound to maintain it in repair. We contend that this doctrine of the court is erroneous.—*First,* because a road can only be established by the laying out of a committee, (or commissioners as the law now stands,) or by *user.* That the report of the committee did not cover this road, the quotation from the case itself shows ; and no other laying out was attempted to be proved. It could not have been established by *user,* for it was built after 1834, and the indictment was found in 1835. The books no where show that a user short of *twelve* years can create a liability on the part of the town, and it may be doubted whether a less time than

*twenty* years can make a town liable. *Second*, because, even admitting, for the sake of argument, that a road had been built by the town, yet the case finds that "*it did not appear that the road built was upon the ground described in the indictment ;*" or, in other words, it did not appear that the road was indicted ; and, if *not* indicted, how then were we to be made liable in this prosecution to maintain the road ?

3d. The court erred in ruling that it was too late to take exceptions to the sufficiency of a report after it had been accepted by the court. But this being a criminal prosecution, it is respectfully urged that the defendants have the right to avail themselves of all informal or illegal proceedings in the laying out of the road. The case finds that they had never, by any act of theirs, acknowledged their liability to maintain the bridge. The report contains errors which would have been good against its acceptance, and against the laying out of the road ; and it would seem but justice that they should be permitted to avail themselves of these errors, and show that the proceedings had been informal and illegal, and therefore not binding upon them.

4th. It is believed with much confidence that the court erred in charging the jury that the *only* question for them to settle was, whether there was a current or not, and that it mattered not "*however small*" the current, or what was the width of the waters, or what they had been called.

If the doctrine of the presiding judge be correct, then are all our large lakes and bays, both in New-Hampshire and other states, nothing in fact but rivers, for in all of them there must necessarily be a "*small*" current towards the outlet ; and if the current be the *only* thing that decides the character of our inland waters, then must these lakes and bays be decided to be private property, and the towns adjoining, by the decision of the judge, be liable to erect bridges over the same. But we contend that such a doctrine cannot be sustained. The court ought not to have narrowed the

question down to the single point of current or no current, "however *small.*" It should have permitted the jury to take into consideration the fact that the waters were described as "Sanbornton *Bay,*" not only in all the deeds of the lands lying about the same, and of the lots adjoining the bridge on both shores, but in the petition for the road, and in the indictment itself. It should have permitted them to take into consideration the depth and width of the waters, the fact that they were twelve miles long and in some places three miles wide; that the people at large had always known them as a *Bay;* that the Legislature had granted to individuals islands below the bridge; that the current was essentially the same as that in Winnipiseogee lake; and that islands had been annexed to the adjoining towns by the Legislature. All these facts and circumstances, and many others that appeared upon the trial, should have been permitted to go to the jury, as also the charters of the towns giving the boundaries of the same, that the jury might be able to decide whether, under all the circumstances, the town was bounded by the shore or centre of the waters.

5th. The Judge ought to have charged the jury that inasmuch as the waters were from five to twenty-seven feet deep, and thirty-seven rods, or more than five hundred and sixty feet wide where the bridge stands, they were *navigable,* and consequently were themselves a public highway over which no bridge could legally be built, without the consent of the Legislature; and that towns lying upon navigable waters were bounded by the shore, and not the centre of the waters, and were not liable to maintain any bridges over the same. It is believed that such has been the doctrine of other states, if not indeed of our own. *Commonwealth* vs. *Coombs,* 2 *Mass.* 489; *Arundel* vs. *McCullock,* 10 *Mass.* 70; *Commonwealth* vs. *Charlestown,* 1 *Pick.* 180; *Canal Commissioners* vs. *The People,* 5 *Wend.* 423; 3 *Kent's Com.* 427, &c.; *Prichard* vs. *Atkinson,* 3 *N. H. Rep.* 335.

6th. The description of the road given in the indictment

is insufficient, and judgment cannot be rendered upon the verdict. *Commonwealth* vs. *North Brookfield*, 8 *Pick.* 463.

7th. Judgment cannot be rendered upon the verdict, inasmuch as the indictment itself shows that the bridge is across a *bay*, and *not* across a *river*. It is a matter of record of which the court is obliged to take notice, and the want of liability on the part of the town is apparent upon the face of the record.

*Gove*, Attorney General, for the state.

GILCHRIST, J.   The case finds that in the year 1834, a committee appointed by the court of common pleas, made a report in favor of laying out a road from a certain point in the town of Gilmanton, to "the Bay meeting-house" in Sanbornton. This report was accepted by the court. The town now excepts to the competency of the report as evidence on the trial of this indictment, on account of certain alleged variances between the petition for the road and the report.

When a report is presented to the court of common pleas for acceptance, the judgment of the court is, either that it be accepted and the road established, that it be rejected for some reason which shows that all the proceedings are invalid, or that it be re-committed to the committee for the purpose of rectifying some mistake, or of calling the parties again before them for some sufficient reason. All exceptions which may be obviated by a re-commitment, should be taken upon the presentment of the report.   But without discussing the proper course to be pursued in such cases, or laying down any general rules, it is sufficient to say that exceptions like the present are made at too late a day.   The judgment of the court accepting the report and establishing the road, cannot be impeached in this collateral manner.  If the judgment be erroneous, there is another mode known to the law, in which the errors may be examined, and the judgment reversed ; and in this case the exceptions must be overruled.

The counsel for the defendant also contends that it is a question of fact for the jury, whether the road described in the indictment be the road laid out by the report of the committee. He alleges that there is a variance between them, and that whether there be a variance, is a question to be submitted to the jury. This matter, if there be any material dispute about it, if it be not sufficiently clear by a comparison of the descriptions, should undoubtedly be submitted to the jury. But where upon inspection of the report it appears distinctly that the road described in the indictment is the road laid out, it is not the mere allegation of the counsel that there is a variance, which calls upon the court to submit the question formally to the jury. A slight examination of this point will show that here is no variance.

One of the courses in the report brings the road to " the N. E. corner of the bridge ; thence north 27° west, over said bridge." The road laid out is considerably longer than that mentioned in the indictment, the latter extending only about half a mile, while the former is nearly three hundred rods long, as appears from the distances given in the report. Thus only a part of the road laid out is indicted. The road laid out begins in Gilmanton, and runs " over the bridge" to Sanbornton, and its general course is south-west. The road indicted begins at the centre of the new bridge, and runs a north-easterly course to its other terminus, without giving the courses and distances. There is a difference in the general course of the two roads, because they start from different points, and this makes an apparent, but no real variance. But the counsel contends that if the report establishes any road, it is at the right hand of the bridge, and not where the indictment alleges it. One course in the report brings the road to the north-east corner of the bridge, and then *over* the bridge. But it makes the line described, the westerly line of the highway. The road, therefore, is easterly of this line, of course, and is thus enabled to cross the bridge, and the road indicted begins at the centre of the bridge.

All that the state need show is, that the road indicted is in-cluded in the description in the report, and that sufficiently appears from the only piece of evidence introduced. We think, therefore, that there was no variance, and that the town has no reason to complain, because the matter was not formally presented to the jury.

With these views of the case, it does not seem material to inquire whether the instruction of the court were correct, that if the road made was intended as a substitute for the road described in the report, though it might vary somewhat from it, as it was of public utility, the town were bound to keep it in repair. If, however, a town should substitute another road for the road laid out by a committee, and should then be indicted for not keeping the substituted road in repair, it might be a question whether they could defend against an indictment by showing that the road they had made and substituted was not in the place where the committee had located a road. And their right to make such defence would be still doubtful, if the road they had made had been accepted by those who had legal authority to accept a dedication on behalf of the public. *Hopkins* vs. *Crombie,* 4 *N. H. Rep.* 520.

But the main question in the case is, whether the water over which the bridge was built is or is not a river. The charge of the court was, that if there were a regular, steady, and perceptible current, however small, it matters not what was the width of the water, or what it had been called, it was a river. This instruction must of course be taken in connection with the subject matter to which it related. The definition would not be applicable to all bodies of water in which there might be a current. A sheet of water in which there is a current from its head towards its outlet, is not, therefore, a river. The outlet of a lake may be a river, but the lake does not lose its distinctive character, because there is a current in it for a certain distance tending towards the outlet. These waters in question lie below the outlet of

lake Winnipiseogee, and the geography of the country in-
forms us that they empty into the Pemigewasset river, and
they are formed by the expansion of the Winnipiseogee river
and other smaller streams. Now as the fact that there is a
current from a higher to a lower level does not make that a
river which would otherwise be a lake, so the fact that a
river swells out into broad, pond-like sheets, with a current,
does not make that a lake which would otherwise be a river.
Where it is admitted, or certainly not denied, as in the pres-
ent case, that the water is not a lake, nor a pond, the mate-
rial difference between which is in size, the only criterion
by which to determine whether it is a river, is the existence
of a current. This question cannot be determined by ascer-
taining what appellations have been given to it. The name
cannot alter the thing ; it cannot be received as a proper
definition of the character of the water. This may be called
Sanbornton bay, or the straits of Gibraltar, but still it may
be a river. Sanbornton bay is a local appellation, which
conveniently enough points out the particular water of which
a person may be speaking ; but this water is clearly not a
bay, and cannot be called so with any attention to geograph-
ical correctness. A bay is a bending or curving of the shore
of the sea or of a lake, and is derived from an Anglo Saxon
word signifying to *bow* or *bend*. For a similar reason the
word bay is in Latin termed *sinus*, which expresses a curva-
ture or recess in the coast. As a matter of convenience, we
may apply to water that name to which custom has famil-
iarized us ; but when it becomes necessary to determine
what a particular body of water actually is, we cannot dis-
regard the etymology of the term used to designate it.

Now the word river is derived from the Latin word *rivus*,
which again is derived from a Greek verb, signifying *to flow*.
In the classic authors it is used in a sense implying a current,
a flowing of water from one point to another. " *Rivorum
a fonte deductio*," " *rivos deducere*," " *tenuis fugiens per
gramina rivus*," are examples of the mode of its use by

Cicero and Virgil.   Webster defines a river to be "a large stream" (which implies a current) "of water flowing in a channel."   Johnson calls it "a land current of water ;" and in Rees' Encyclopædia it is defined to be "a current of water."   Richardson, the most learned and satisfactory of modern English lexicographers, defines a river to be "a flood or flowing course ; a current ; a stream of water ;" and this definition expresses what we mean ordinarily, when we speak of a river.   It is intimated in *The State* vs. *Gilmanton*, 9 *N. H. Rep.* 461, that a current would indicate that the water at that place is a river ; and the opinion of the court is, that the instruction was correct.

It is contended that the town is not bound to maintain this bridge, because the water is navigable, and the town extends only to the shore, and not to the centre of the water. The question whether the water be a river or not, is important only upon the ground that if it be a river, the town, as it extends to the river, is bounded by the centre of the stream, whereas if it strikes any large body of standing water, by whatever name it is called, it is bounded by the water's edge.   *The State* vs. *Gilmanton*, 9 *N. H. Rep.* 461. As to the navigableness of this river, the act of July 2, 1838, provides that no bridge shall be constructed across streams above tide water, which may be navigable for boats, rafts, or logs, so as to prevent the navigation or use of such streams for those purposes.   See, also, *Rev. St.* 119, § 10. And this provision has this effect upon bridges erected previous to its enactment, that a town could not be indicted and fined for neglecting to keep a bridge in repair, if it impeded the navigation of a river in the manner intended to be prohibited by the statute.   The common law considers all rivers where the tide does not ebb and flow, as inland rivers, not navigable.   *Scott* vs. *Willson*, 3 *N. H. Rep.* 321.   But rivers not navigable, in the common law sense of that term, (it is said in that case,) may, by usage, become public highways. In *Shaw* vs. *Crawford*, 10 *Johns.* 236, the Battenkill river

was held to be a public highway, as it had been used for rafting for twenty-six years and upwards; and it was said by the court that when a river is so far navigable as to be of public use in the transportation of property, the public claim to such navigation ought to be liberally supported. The free use of waters, which can be made subservient to commerce, has, by the general consent of mankind, been considered as a thing of common right. It is said by Lord *Hale, De jure maris, Hargrave's Ed.* 8 *&* 9, " there be other rivers as well fresh as salt, that are of common or public use for carriage of boats and lighters; and these, whether they are fresh or salt, whether they flow and re-flow, or not, are *prima facie, publici juris*, common highways for a man or goods, or both, from one inland town to another." In the case of *The People* vs. *Platt,* 17 *Johns.* 211, the distinguishing test between those rivers which are entirely private property, and those which are private property subject to the public use and enjoyment, is said to consist in the fact whether they are susceptible or not, of use as a common highway for the public. And this distinction is recognized in the *Canal Commissioners* vs. *The People,* 5 *Wend.* 423.

But it is unnecessary to make a farther investigation into the cases, for the most liberal regard to the rights of the public, would not authorize us to declare that this river is navigable in any sense of the word, which would prohibit the erection of a bridge across it. Even if its being capable of being navigated by rafts should be held sufficient to make it navigable, it does not appear that this bridge would impede such a navigation. The case finds only that it is navigable by rafts. Now a raft may be made by lashing together two pieces of plank; and the word comprehends not only this, but a floating structure of timber of great value and extent. Of the numerous varieties of rafts, what description could be transported here, does not appear. The mere depth of the water is no criterion, for, although it is from five to twenty-seven feet deep at the bridge, it does not follow that

it could be used for the purposes of commerce. But there is another important consideration. It does not appear that the river was ever used by the public for the purpose of a highway. This is the surest test, and is the one relied on in the cases before referred to. There is no evidence that a raft or boat ever floated upon its waters. And it certainly was not the intention of the act of 1838, or of the revised statutes, to prohibit the erection of a bridge, where, judging of the future by the past, no navigation would ever exist, upon the ground merely, that the river might be navigated, possibly, at some indefinite period hereafter.

The grounds of the sixth exception taken in the argument, are not stated, and the case referred to, *Commonwealth* vs. *North Brookfield,* 8 *Pick.* 483, merely decides that an indictment, stating that *a certain part* of a highway was out of repair, was defective, because it did not allege in which of two towns the unrepaired part was situated.

The seventh exception is included in the remarks we have already made concerning the appellations which have been given to the water.

*Judgment on the verdict.*