98

LAKE SUNAPEE PROTECTIVE ASSOCIATION

v.

THE NEW HAMPSHIRE WETLANDS BOARD

AND

M.J.S. ENTERPRISES, INTERVENOR

April 30, 1990

*Frank H. Gordon* and *John M. Holton, Jr.*, of New London (*Mr. Gordon* and *Mr. Holton* on the brief, and *Mr. Gordon* orally), for the plaintiff, Lake Sunapee Protective Association.

*Stephen E. Merrill*, attorney general (*Geoffrey M. Huntington*, assistant attorney general, and *Charles B. Holtman*, assistant attorney general, on the brief, and *Mr. Huntington* orally), for the defendant, the New Hampshire Wetlands Board.

*McSwiney, Jones, Semple & Douglas P.C.*, of New London (*Robert E. Bowers, Jr.*, on the brief and orally), for the intervenor, M.J.S. Enterprises.

THAYER, J.   This case is before the court on appeal from an order of the Superior Court (*DiClerico,* J.), approving the Master's (*R. Peter Shapiro,* Esq.) report and recommendation, denying the appeal of the Lake Sunapee Protective Association (LSPA) and affirming the decision of the New Hampshire Wetlands Board (the board) to grant a dredge and fill permit to the intervenor, developer M.J.S. Enterprises (M.J.S.). In its appeal, LSPA sought to have the permit vacated and to have the application referred to the Governor and Executive Council. For the reasons that follow, we reverse the decision of the trial court, and remand this case for findings of fact and rulings of law not inconsistent with this opinion.

The plaintiff raises three issues on appeal. LSPA's primary contention is that the board alone is not empowered to approve M.J.S.'s permit application, that it must also be approved by the Governor and Executive Council. This question, as presented to us, is a jurisdictional one, focusing on the potential applicability of two similar yet differing statutes and the resulting consequences of applying the appropriate one. In effect, the entire issue turns on whether a proposed dredging and excavation project is located on Red Water Creek or on Lake Sunapee. LSPA maintains that a portion of M.J.S.'s anticipated construction project will necessitate dredging an area of the bed of Lake Sunapee, and, therefore, that approval of the Governor and Executive Council is required pursuant to RSA chapter 488-A. The board, however, contends that it alone is vested with jurisdiction to approve or disapprove the issuance of a permit, as the entire project will be confined to Red Water Creek. The board argues that RSA chapter 488-A is inapplicable and that RSA chapter 483-A is controlling. LSPA also complains that certain actions by the board served to deprive the plaintiff of due process of law. Finally,

LSPA claims that the procedure applied in allowing M.J.S.'s bill of costs violated the rules of the superior court and led to erroneous results.

M.J.S., a New Hampshire limited partnership, owns approximately thirty-four acres of land in the town of Sunapee. The property, located near Fisher's Bay, has frontage on both Red Water Creek and Lake Sunapee. As part of an overall scheme to develop the premises as a four-season recreational community, M.J.S. intends to provide the residents of the proposed condominiums with boat docking facilities and access to the lake. In order to accomplish this, M.J.S. proposes to dredge and excavate a section of what is either the bed of Lake Sunapee or that of Red Water Creek. As mentioned previously, the determination of whether lake bed or creek bed is involved in this project is critically important to the present controversy, as it may resolve the question of whether RSA chapter 488-A applies.

While it is true that the statutes are somewhat similar, it is important to recognize the jurisdictional difference between the two. RSA chapter 483-A, as effective at the time of M.J.S.'s proposal, provided that "[n]o person shall excavate, remove, fill, dredge or construct any structures in or on any bank, flat, marsh, or swamp in and adjacent to any waters of the state without written notice" to the board of his intention to do so. RSA 483-A:1, I (1983) (current version codified at RSA 482-A:3, I (Supp. 1989)). It further mandated that the "board shall hold a public hearing on proposals under RSA 483-A:1 in accordance with regulations promulgated by the board." RSA 483-A:2 (1983) (current version codified at RSA 482-A:8 (Supp. 1989)). Although jurisdiction over the initial determination was vested entirely in the board, any party dissatisfied with its decision was able to apply for a rehearing and to appeal to the superior court pursuant to RSA 483-A:4, I (1983) (current version codified at RSA 482-A:10, I (Supp. 1989)).

In contrast, RSA chapter 488-A, as effective at times relevant to this controversy, provided that "[n]o person, firm, or corporation shall excavate, remove, or dredge any bank, flat, marsh, swamp, or lake bed that lies below the natural mean high water level of any public waters of this state, except as provided in this chapter." RSA 488-A:1, I (1983) (current version codified at RSA 482-A:21 (Supp. 1989)). RSA 488-A:2, entitled "Grant of Right," provided that "[t]he governor and council, upon petition and upon the recommendation of

the wetlands board, may, for just consideration, grant to an owner of a shoreline on public waters the right to excavate, remove, or dredge any bank, flat, marsh, swamp or lake bed before his shoreline." RSA 488-A:2 (1983) (current version codified at RSA 482-A:22 (Supp. 1989)). Thus, any application for a permit pursuant to RSA chapter 488-A had to be approved by both the board and the Governor and Executive Council. It is also noteworthy that, unlike RSA chapter 483-A, which set forth the procedure for an aggrieved party to appeal the board's decision, RSA chapter 488-A contained no such provision for appeal. *See Yoffe v. Special Board,* 113 N.H. 169, 173, 304 A.2d 876, 878 (1973).

For purposes of RSA chapter 488-A, "public waters" were "defined as all natural ponds of more than 10 acres." RSA 488-A:1, I (1983) (current version codified at RSA 482-A:21, I (Supp. 1989)). The parties do not dispute the fact that Lake Sunapee is indeed a "public water" of this State and that, if the anticipated dredging and excavation were to take place in the lake itself, the application would have to be approved by both the board and the Governor and Executive Council. There initially appears to have been some controversy as to whether the proposed project could be characterized as a "minor one," thus invoking the exception to RSA chapter 488-A delineated at RSA 488-A:1, II(c) (1983) (current version codified at RSA 482-A:21, II(c) (Supp. 1989)). This is no longer the case, however, as the M.J.S. application clearly constitutes a "major project" according to the board rules. A "major project" is classified as one which entails "[c]onstruction of . . . any community docking system," N.H. ADMIN. RULES, Wt 302.01(d), and a "major docking system" is, *inter alia,* one that "provide[s] for docking of more than 10 boats," N.H. ADMIN. RULES, Wt 101.19. Because M.J.S.'s proposal contemplates docking facilities for seventeen boats, it must be characterized as a "major project." Therefore, the gravamen of this dispute is the exact location of the project site and the precise boundaries of the lake and the creek.

In September of 1985, M.J.S. first submitted an application to the board under RSA chapter 483-A, requesting a permit to dredge and excavate in and along Red Water Creek. This initial proposal contemplated making "cuts" in the bank of Red Water Creek to allow the condominium residents water access via individual canals. It also called for the dredging of the creek "[t]o allow boats further access upstream," and for the construction of eight boat docks. Although a

public hearing was held on November 12, 1985, no decision was ever rendered concerning this first proposal, as M.J.S. asked the board to reserve ruling on the project until alternative methods for creating water access and docking facilities could be investigated.

Roughly one year later, on December 2, 1986, a second public hearing was held pursuant to RSA chapter 483-A, at which time a modified proposal was presented for the board's consideration. M.J.S. requested a permit to dredge 1,500 yards and to excavate 2,000 yards of material. Instead of individual canals and piers, this second proposal contemplated construction of one semi-circular boat basin with fourteen floating piers and slips providing docking for thirty boats. The facility was to be located at the confluence of Red Water Creek and Lake Sunapee, downstream from the projected site of the canals envisioned by the initial proposal. The board unanimously denied M.J.S.'s application on December 16, 1986.

On January 6, 1987, however, the board unanimously agreed to reopen the matter for another public hearing. At that hearing, held on February 17, 1987, M.J.S. presented yet another revised proposal of its initial plan. Although this third proposal still contemplated dredging 1,500 yards and excavating 2,000 yards of material, the semi-circular boat basin was to provide docking for only seventeen boats.

After the ten-day public comment period following the February 17th hearing had passed, but before the board rendered its decision, the jurisdictional question at issue in this case was first raised. In his March 16, 1987 letter to Delbert F. Downing, the chairman of the board, it was suggested by the president of the LSPA, Courtland Cross, "that there may well be lack of complete jurisdiction of the Board in this matter resulting from the change in the permission sought by modification of the petition and from the evidence offered in support thereof." Mr. Cross maintained that the revised proposal, envisioning a crescent-shaped boat basin, "would be created by dredging and excavating a bank of Lake Sunapee where the Creek enters the Lake." A second letter was sent on April 20, 1987, in which Mr. Cross again urged that M.J.S.'s application must be presented to the Governor and Executive Council pursuant to RSA chapter 488-A. He reiterated that "[a]lthough the original petition came under RSA 483-A, because petitioner sought to dredge Red Water Creek only, it appears . . . that the first and second revisions involve a major proposal for excavating and dredging in and about Lake Sunapee itself,"

thus requiring a petition to the Governor and Executive Council. Once the issue of RSA chapter 488-A applicability was raised, the board was left to determine (1) the exact location of all aspects of the proposed project site with respect to the boundary between the lake and the creek, and (2), if lake, whether the contemplated activity would take place above or below the natural mean high water level.

Apparently in an effort to deal with this issue, the board requested that the attorney general's office review the matter and issue an opinion as to the applicability of the arguably relevant State statutes. The inquiry focused on "whether MJS, given the specific circumstances of the proposed development, must receive final approval from the Governor and Executive Council pursuant to either RSA ch. 488-A or RSA 482:41-e . . ., or whether the . . . application is exclusively within the jurisdiction of the Wetlands Board, under RSA ch. 483-A." The attorney general's office determined in a letter issued on July 6, 1987, that the board's "jurisdiction over the MJS project under RSA ch. 483-A and rules promulgated thereunder [could not] be disputed." And although the office further concluded that M.J.S.'s application had to "be referred to Governor and Executive Council pursuant to RSA ch. 488-A," this latter opinion was rendered with the understanding that the project was located on Lake Sunapee. It was specifically stated in a footnote of the opinion letter that "[w]hile the MJS marina will be placed at the confluence of Red Water Creek and Lake Sunapee, we assume for the purposes of this letter that the dredging . . . will occur on the bed of the lake and not that of the creek." Because the attorney general's office considered this issue under the *assumption* that "the MJS application propose[d] to excavate portions of the bank of Lake Sunapee, dredge lake bed below the mean high water mark, and construct piers for boats," the opinion shed no light on the critical question of whether the project was in the creek or the lake.

Before making its decision, the board conducted a field inspection on April 30, 1987. At its June 9, 1987 meeting, the board unanimously approved M.J.S.'s permit application, subject only to the pending ruling of the attorney general discussed above. LSPA submitted a motion for rehearing on June 29th. On July 7, 1987, the day after the attorney general's opinion letter was issued, the board voted to release the permit and to deny the motion for rehearing "as no new information was given or questions raised." It is important to note that the minutes of this July 7th meeting reflect a unanimous deci-

sion of the board that the dredging project was confined to Red Water Creek. Although the permit specifically authorizes M.J.S. to "excavate [a] moon shaped channel and erect nine (9) piers, dredge [the] creek for two navigational channels to [the] creek, [and] install gabions and riprap to protect [the] banks," this approval was granted on the condition that there would be no dredging in Lake Sunapee itself.

On July 10, 1987, notice of the board's decision informing him that the board "did make the observation that it has considered this project to be located in and on Red Water Creek near Lake Sunapee" was sent to Attorney Frank Gordon, counsel for LSPA. The board sent a similar statement, also dated July 10, 1987, to Senior Assistant Attorney General Robert Cheney. In that letter, Mr. Downing explained that the

> "Board voted to release the permit which had been approved on June 9, 1987. This action was considered to be compatible with the [Attorney General's] opinion and RSA 488-A as the Board considers this project to be located in and adjacent to Red Water Creek while [the opinion letter] assumed that the proposed dredging was located in Lake Sunapee."

Dissatisfied with the board's ruling, LSPA appealed the decision to the superior court pursuant to RSA 483-A:4, I (Supp. 1988) (current version codified at RSA 482-A:10, I (Supp. 1989)). The case was subsequently assigned to the master, who viewed the subject site, locations upstream, and an area of Lake Sunapee. These same areas were viewed by members of the board during their April 30, 1987 field inspection. In addition to taking the view and considering the information presented to the board, the master also heard additional testimony at the hearing of this matter. In particular, Charles Hale, "an expert in determining flow or velocity of bodies of water," testified that when he visited the location on October 20, 1987, there was a discernable flow in the project site area. It is clear from the master's report that he relied on this information in finding that the board's decision that the project was confined to Red Water Creek was not unreasonable. Stating that the "New Hampshire Courts have recognized that the presence of a regular, precipitable [sic] current, regardless how small, would identify the place as a stream or river," and relying upon the fact that "[e]vidence was presented that confirmed the existence of a precipitable [sic] and constant flow in the

subject area," the master concluded that the board's decision was "reasonable and lawful and should not be set aside."

■ "We begin by noting that the findings of the board are prima facie lawful and reasonable on appeal." *State Wetlands Bd. v. Marshall*, 127 N.H. 240, 245, 500 A.2d 685, 687 (1985); *see* RSA 677:6. The law is well settled that "[a] decision of the board may not be set aside by the superior court unless there is an error of law or unless 'the court is persuaded by the balance of probabilities, on the evidence before it, that said decision is unreasonable.'" *Durant v. Town of Dunbarton*, 121 N.H. 352, 357, 430 A.2d 140, 143–44 (1981) (quoting RSA 36:34, V (Supp. 1979) (recodified in 1983 in RSA 677:6)). In this case, the master found that the "New Hampshire Wetlands Board used the appropriate legal standard to determine whether the subject area was in Lake Sunapee or Red Water Creek." He further found that the "factual determinate that the subject area was within Red Water Creek and not in Lake Sunapee made by the New Hampshire Wetlands Board was reasonable." These findings were approved by the trial court.

On appeal to this court, the plaintiff maintains that the master abused his discretion and erred as a matter of law in utilizing the theory of perceptible flow to determine the boundary between Red Water Creek and Lake Sunapee. LSPA contends that the borders of a great pond or lake are determined solely by its natural mean high water level, that a stream entering a lake becomes part of the lake where it meets the natural mean high water level, and that the factual record before the board placed the M.J.S. project at least partially in the lake. The plaintiff, therefore, insists that the mandates of RSA chapter 488-A are triggered in this case.

The board and intervenor, on the other hand, argue that an activity otherwise falling under RSA chapter 488-A is subject to the chapter only if it satisfies both prongs of a two-part test. More specifically, they claim that the activity must take place (1) below the natural mean high water level (2) of any public waters of this State. They insist that "dredging within a Great Pond, but above its natural mean high water level, is not subject to the chapter," and that "dredging not in a Great Pond is not subject to RSA Ch. 488-A, regardless of the elevation at which it would occur." Thus, the defendant board and the intervenor claim that the actual boundary of the lake must be ascertained before the two-part test can be applied. They further claim that the boundary issue is a question of fact left to the deter-

mination of the board, and that in this case the board's decision was reasonable. They also argue that the master did not err as a matter of law in relying on the theory of perceptible flow to ascertain the boundary between the lake and the creek.

■ Our standard of review of "a court-approved master's recommendation is that the findings and rulings will be upheld unless they are unsupported by the evidence or are erroneous as a matter of law." *Claridge v. N.H. Wetlands Bd.*, 125 N.H. 745, 748, 485 A.2d 287, 289 (1984) (citing *Summit Electric, Inc. v. Pepin Brothers Constr., Inc.*, 121 N.H. 203, 206, 427 A.2d 505, 507 (1981)). "The test on appeal is not whether we would have found as the master did, but whether there was evidence on which he could reasonably base his finding." *Win-Tasch Corp. v. Town of Merrimack*, 120 N.H. 6, 9, 411 A.2d 144, 146 (1980); *see Rowe v. Town of North Hampton*, 131 N.H. 424, 428, 553 A.2d 1331, 1334 (1989); *Durant v. Town of Dunbarton*, 121 N.H. at 357, 430 A.2d at 144. Because we fear that the master relied almost exclusively on the theory of perceptible flow in determining the boundary between the lake and the creek, and are unable to ascertain from the record the extent to which other factors, if any, were considered by him in reaching his decision, we are constrained to reverse his decision and remand this case.

The board considered this project to be located on Red Water Creek. In evaluating the reasonableness of this decision, the master recognized that the "first issue to be resolved is the boundary line" between the two bodies of water. Relying extensively on the testimony of Charles Hale and applying what he understood to be the law of this State, the master found that since there was a perceptible flow in the subject area, the dredging project was located in the creek. He stated that "a stream flowing into a lake may continue to be identified as a stream for as long as its current is discernable." The finding that the project was confined to the creek led to the ultimate conclusion that RSA chapter 488-A, requiring the approval of the Governor and Executive Council, was inapplicable.

■■ The plaintiff first complains that the theory of perceptible flow was never before the board, that it was considered for the first time on appeal to the superior court. Although true, this fact is of no moment. The master was clearly authorized by statute to hear additional testimony. RSA 677:10. "The purpose of the statutory provisions for the receipt of . . . additional evidence is not to afford . . . a trial *de novo*, . . . but rather 'to assist the court in evaluating the

action of the [board].'" *Sweeney v. Dover*, 108 N.H. 307, 309, 234 A.2d 521, 522 (1967) (quoting *Village Builders, Inc. v. Town Plan & Zoning Commission*, 145 Conn. 218, 221, 140 A.2d 477, 478 (1958)). If the record of the evidence before the board is either incomplete or non-existent, a party may present further evidence to the trial court. This additional evidence may be taken into consideration even though it was not before the board. *Pappas v. City of Manchester Zoning Board*, 117 N.H. 622, 625, 376 A.2d 885, 886 (1977); *see Rowe v. Town of North Hampton*, 131 N.H. at 428, 553 A.2d at 1333.

The fatal flaw in the decision-making of this case lies not with the fact that additional testimony was taken, but rather with the fact that the master appears to have relied almost exclusively on the theory of perceptible flow in determining the boundary between the lake and the creek. As support for the use of the perceptible flow theory, the master relied on two nineteenth-century New Hampshire cases, *State v. Gilmanton*, 14 N.H. 467 (1843), and *Concord Co. v. Robertson*, 66 N.H. 1, 25 A. 718 (1889). In neither of these cases do we find support for the proposition that the *sole* criterion by which to determine the boundary between a lake and a creek or stream is the existence or non-existence of a perceptible flow.

In *Gilmanton*, the town was indicted for failing to repair the bridge connecting Gilmanton and Sanbornton. The main question in that case was "whether the water over which the bridge was built [was] or [was] not a river." *State v. Gilmanton*, 14 N.H. at 476. This determination was important to the outcome of the case because the extent of the town's responsibility hinged on the nature or kind of waterbody beneath the bridge. If a river, responsibility would run to the center of the waterbody; if a great pond, then only to "the water's edge." *Id*. at 478. The specific charge to the jury in the case was, "that if there were a regular, steady, and perceptible current, however small, it matter[ed] not what was the width of the water, or what it had been called, it was a river." *Id*. at 476. It is particularly important to note, however, that this instruction was given with the caveat that it "must of course be taken in connection with the subject matter to which it related," that "[t]he definition would not be applicable to all bodies of water in which there might be a current." *Id*. The *Gilmanton* court recognized that "the fact that there is a current from a higher to a lower level does not make that a river which would otherwise be a lake." *Id*. at 477. In fact, the court limited the scope of its decision by stating that "[w]here it is admitted, or certainly not

denied, as in the present case, that the water is not a lake, . . . the only criterion by which to determine whether it is a river, is the existence of a current." *Id.* We also note that the issue to be resolved in the *Gilmanton* case involved a waterbody flowing out of a lake, not a stream flowing *into* a lake, as in the case currently before us.

The *Concord Co.* case, also relied upon by the master, traces the historical ownership by the people of public waters, and suggests that "a current is *not* the only competent evidence of the points at which . . . changes occur in the boundary line." *Concord Co. v. Robertson,* 66 N.H. at 4, 25 A. at 719 (emphasis added). With reference to *State v. Gilmanton,* the *Concord Co.* court indicated that the "question might be one of fact, on the trial of which the current might be one of the items of competent evidence, . . ." *Id.* The court went on to say tnat a

> "view, taken by court or jury, without a ruling or instruction on any question of !aw, might be enough. To ocular proof could be added other evidence of the current, the quantity of water, and the comparative size and form of the basin of the bay and the channel of the river."

*Id.*

■ We hold that the existence or absence of a detectable flow cannot be relied upon to fix the precise boundary between two waterbodies. If it were true that the boundary between a stream and lake is located at the point where there is no longer a discernable flow, there would be no consistent boundary. The precise point at which the flow will no longer be detectable will necessarily fluctuate with the seasons. During the spring, when the rains and melting snow cause the stream to swell and flow more quickly, this flow will be discernable further out into the lake than it will be during the late summer months. This inherent inconsistency renders this theory insufficient to provide the primary or sole indication of a waterbody's boundary. To hold otherwise would defy common sense and wreak havoc on the firmly rooted laws pertaining to riparian and littoral owners' property rights.

The precise boundary between the lake and the creek involves a determination of fact, and we by no means suggest that the determination is an easy one. Obviously, the exact point at which Red Water Creek ends and Lake Sunapee begins is difficult to ascertain. *See Hilton v. Special Board,* 111 N.H. 381, 384, 284 A.2d 917, 919 (1971); *State v. Stafford Co.,* 99 N.H. 92, 99, 105 A.2d 569, 574 (1954). In

order to avoid inconsistent and *ad hoc* factual determinations, specific criteria must be evaluated when fixing the boundary line.

■ In the present case, the master appears to have relied primarily on the theory of perceptible flow to support the reasonableness of the board's decision. We hold that to have given such weight to the perceptible flow theory when establishing the boundary between the lake and the creek constituted an error of law. We therefore reverse the decision of the trial court and remand the case with instructions to revisit the issues presented by this case, particularly those pertaining to the lake-creek boundary and the applicability of RSA chapter 488-A. We note that in order for the statute to be relevant, the proposed activity must involve "lake bed that lies below the natural mean high water level of any public waters of this State." We further note that the master's statement that the board "held that the subject area was not below the natural mean high water mark of Lake Sunapee" appears to have been in error.

In light of our decision, we do not address plaintiff's other arguments, relating to due process and the allowance of costs, at this time.

*Reversed and remanded.*

All concurred.