MERRIMACK, DECEMBER, 1889.

CONCORD MANUFACTURING CO. *v.* ROBERTSON *& a.*

Large natural ponds are held by the state in trust for public use. Under governmental grants of land bounded by them, or of tracts of land in which they are situated, the boundary is the water's edge.

Long pond, in Concord, containing 260 acres, is a large pond within the meaning of the common-law rule.

A governmental grant of land on a stream flowing from a large pond conveys a right in the stream which is not subject to diminution or disturbance by an unreasonable use of the pond.

CASE, for diverting water from the plaintiffs' mills, which are situated about one hundred rods below the outlet of Long pond in Concord, on the stream that flows from the pond to Merrimack river. Facts agreed. The defendants are engaged in the business of cutting and storing ice and selling it to the citizens of Concord. Having hired a tract of land bordering on the pond, they went from it upon the pond, and cut and carried away ice to be sold in the usual course of their business. The plaintiffs claim that the flow of water from the pond to their mills was perceptibly and substantially diminished, and their right infringed, by the defendants' removal of ice. The pond, in its natural state, contained about 260 acres. The adjoining land was divided among original proprietors of the township, in lots bounded by the pond.

*S. C. Eastman* and *J. S. H. Frink,* for the plaintiffs, cited *Com.* v. *Alger,* 7 Cush. 53, 68; *Elliot* v. *F. R. Co.,* 10 Cush. 191; *Cummings* v. *Barrett,* 10 Cush. 186; *West Roxbury* v. *Stoddard,* 7 Allen 158; *Paine* v. *Woods,* 108 Mass. 160; *Cowles* v. *Kidder,*

24 N. H. 364, 378, 379; *Runnels* v. *Bullen*, 2 N. H. 532, 537; *Bealey* v. *Shaw*, 6 East 208; *Embrey* v. *Owen*, 6 Ex. 353; *Watuppa R. Co.* v. *Fall River*, 134 Mass. 267; *Mill River Co.* v. *Smith*, 34 Conn. 462; *State* v. *Pottmeyer*, 33 Ind. 402; *W. Ice Co.* v. *Shortall*, 101 Ill. 46.

*Chase & Streeter* and *W. L. Foster*, for the defendants, cited *Com.* v. *Alger*, 7 Cush. 53, 67; *Nudd* v. *Hobbs*, 17 N. H. 524, 526, 527; *State* v. *Rollins*, 8 N. H. 550, 561; *West Roxbury* v. *Stoddard*, 7 Allen 158; *Paine* v. *Woods*, 108 Mass. 160, 173; *Fay* v. *S. Aq. Co.*, 111 Mass. 27; *Hittinger* v. *Eames*, 121 Mass. 539; *Gage* v. *Steinkrauss*, 131 Mass. 222; *Rowell* v. *Doyle*, *ib.* 474; *Watuppa R. Co.* v. *Fall River*, 147 Mass. 548; *P. Ice Co.* v. *Steamer*, 44 Mich. 229; *Barrows* v. *McDermott*, 73 Me. 441; *Brastow* v. *R. Ice Co.*, 77 Me. 100; *Stevens* v. *Kelley*, 78 Me. 445; *Woodman* v. *Pitman*, 79 Me. 456; *Crawford* v. *Rambo*, 44 Ohio St. 279; *Hayes* v. *Waldron*, 44 N. H. 580; *N. P. Co.* v. *Bradley*, 52 N. H. 86, 109; *Holden* v. *Lake Co.*, 53 N. H. 552; *Green* v. *Gilbert*, 60 N. H. 144.

DOE, C. J.    By the grant of the original township of Gilmanton (including territory afterwards set off as Gilford and Belmont), made in 1727 and amended in 1729 by the provincial executive in the name of the king, the premises were bounded by two lines, one running from the westerly corner of Barnstead north-west "to Winnipesaukee Pond or the river that runs out of the said Pond," the other running from the westerly corner of Barnstead north-east six miles on the Barnstead line, then north-west two miles, "then north to Winnipesaukee Pond, then on the said Pond and river to meet the first line."    The river Winnipesaukee, running out of Lake Winnipesaukee, flows into and out of Sanbornton bay (now commonly called Lake Winnesquam).    The title of the township of Gilmanton passed from the king to the grantees as private owners and tenants in common (*Lawrence* v. *Haynes*, 5 N. H. 33, 37, *Att'y Gen.* v. *Tarr*, 148 Mass. 309, 311), and their water boundary was the lake, the river, and the bay.    Besides being a conveyance of land to the persons named as grantees, the grant was a town charter, issued to "the said men and inhabitants or those that shall inhabit said town;" and it contained no express allusion to a distinction between the boundary line of the private land-title, and the jurisdiction line of the municipal corporation.

In *State* v. *Gilmanton*, 9 N. H. 461, the town was indicted for not repairing Mosquito bridge, which connected Gilmanton and Sanbornton at a place where the boundary was either a part of the river or a part of the bay.    In the agreed statement of facts on which the case was first submitted, it is said (*p.* 462) that the "bay is about ten miles long, and from two to three miles wide in the broadest part;" that the bridge is "about thirty-seven rods long;" and that "there is so much current where this bridge is,

that no ice forms about it." It was held that the agreed statement must be discharged for a trial of the question whether the water at the bridge was a river. If it was a river, the centre of it was the line to which the town was bound to repair. If it was not a river, but a part of the bay which is a large pond, the boundary of private land-title at that place was the water's edge. It was assumed that the line of private ownership was the limit of the defendants' territorial jurisdiction and public duty. And upon this assumption it was necessary to ascertain whether the water under the bridge was river or pond. The ground of the decision is stated ( *p.* 463) by *Parker,* C. J. " Where a grant is made extending to a river, and bounding upon it, the centre of the stream is the line of the boundary. . . . But in relation to grants bounding on ponds, lakes, or other large bodies of standing fresh water, that principle does not apply, but the grant extends only to the water's edge. . . . If, therefore, the line of the township of Gilmanton . . . strikes a river, and the boundary is then upon a river, the grant extends to the thread of the river; but if it strikes any large body of standing water, by whatever name it is called, it will go only to the water's edge."

At the subsequent trial, the court instructed the jury that " the point for them to settle was whether there was a current or not; and if they should find that there was a regular, steady, and perceptible current, however small, it mattered not what was the width of the water, or what it was called, it was a river, and the defendant was liable to maintain the bridge." *State* v. *Gilmanton,* 14 N. H. 467, 470. The defendants, being found guilty, moved for a new trial, and contended ( *p.* 472) that if the instructions given to the jury were correct, " then are all our large lakes and bays . . . nothing in fact but rivers, for in all of them there must necessarily be a small current towards the outlet; and if the current be the only thing that decides the character of our inland waters, then must these lakes and bays be decided to be private property, and the towns adjoining . . . be liable to erect bridges over the same." It was held ( *pp.* 476, 477) that " the fact that there is a current from a higher to a lower level does not make that a river which would otherwise be a lake; " that the definition of river on which the verdict was found " would not be applicable to all bodies of water in which there might be a current;" that the instruction given to the jury " must, of course, be taken in connection with the subject-matter to which it related;" and that " where it is admitted, or certainly not denied, as in the present case, that the water is not a lake, nor a pond, the material difference between which is in size, the only criterion by which to determine whether it is a river is the existence of a current."

An admission that the water was neither lake nor pond would have been an admission that it was a river, and would have left no question for the jury. Judicial notice was taken of the geography

of the country (*p.* 477), a knowledge of which might enable the court to decide whether the water at the bridge was a part of the river or a part of the bay. The question might be one of fact, on the trial of which the current might be one of the items of competent evidence, and for the decision of which a legal test might not be necessary. A view, taken by court or jury, without a ruling or instruction on any question of law, might be enough. To ocular proof could be added other evidence of the current, the quantity of water, and the comparative size and form of the basin of the bay and the channel of the river. The judgment, ordered on the verdict, established the fact that (for the purposes of that suit) the water under the bridge was a part of the river. At some place, the water ceases to be Winnipesaukee lake, and begins to be Winnipesaukee river. Further south, it expands into another large pond, from which it issues, still further south, as a river. At each of these places of expansion and contraction, the boundary of private land-owners runs from the water's edge to the middle of the river. The second decision in the Gilmanton case seems to determine that a current is not the only competent evidence of the points at which these changes occur in the boundary line.

However unsatisfactory *State* v. *Gilmanton* may be on the mode of finding the line between large ponds and streams running into or out of them, on other subjects it is clear and decisive. A large pond is not private property. When land, granted by the government to individuals for private use, is bounded by such a pond, the boundary is the water's edge. Sanbornton bay is a large pond. It does not appear that there had been any doubt on these points in this state before the first decision of the Gilmanton case in 1838. Since that time they have not been open questions. In respect to title, the law divides natural fresh-water ponds into two classes,—the small, which pass by an ordinary grant of land, like brooks and rivers, from which, as conveyable property, they are not distinguished,—and the large, which are exempted from the operation of such a grant for reasons that stop private ownership at the water's edge of the sea and its estuaries. Tide-waters and large ponds are public waters. Whatever exceptions, if any, may be found, this is the rule. It is well known that the fee of Lake Winnipesaukee and Sanbornton bay is not in the owners of the adjoining land, and that all natural pools of fresh water are not the property of the state. The standard of size, or other test, that establishes their public or private title, is a point left undecided by our reported cases. But the law, classing large ponds with tide-waters, and small ponds with fresh rivers and brooks, necessarily provides a mode of determining to which class every pond belongs.

By the decision in *State* v. *Gilmanton*, and by uniform usage and a general concurrence of opinion, it is settled that the dis-

tinction between public and private waters is not based on tidal motion, or on the presence of salt. The action of the tide furnishes a convenient means of locating the boundary of the largest reservoir of public water (*The Genesee Chief,* 12 How. 443, 455), but does not show what reservoirs of fresh water are the property of the state. For the purposes of admiralty jurisdiction and the federal power of regulating commerce, "the doctrine of the common law as to the navigability of waters has no application in this country. Here the ebb and flow of the tide do not constitute the usual test, as in England, or any test at all of the navigability of waters. There no waters are navigable in fact, or, at least, to any considerable extent, which are not subject to the tide; and from this circumstance tide-water and navigable water there signify substantially the same thing. But in this country the case is widely different. . . . A different test must, therefore, be applied to determine the navigability of our rivers, and that is found in their navigable capacity. Those rivers must be regarded as public navigable rivers in law which are navigable in fact." *The Daniel Ball,* 10 Wall. 557, 563; *The Genesee Chief,* 12 How. 443, 454, 455; *Fretz* v. *Bull,* 12 How. 466; *The Magnolia,* 20 How. 296, 299; *The Commerce,* 1 Black 574; *The Hine* v. *Trevor,* 4 Wall. 555; *The Eagle,* 8 Wall. 15; *The Montello,* 20 Wall. 430; *Miller* v. *Mayor,* 109 U. S. 385, 395. The reason of the English rule "was that the limit of the tide in all the waters of England was . . . the limit of practicable navigation, and . . . as there could be no use for an admiralty jurisdiction where there could be no navigation, this test of the navigability of those waters became substituted as the rule, instead of the navigability itself. Such a rule . . . could have no pertinency to the rivers and lakes of this country, for here no such test existed. . . . The true rule in both countries was the navigable capacity of the stream; and as this was ascertained in England by a test which was wholly inapplicable here, we could not be governed by it." *The Hine* v. *Trevor,* 4 Wall. 555, 565.

For highway purposes, fresh water is navigable, in the American common-law sense, if it is in fact, in its natural condition, reasonably capable of valuable use as a public way. *Conn. R. L. Co.* v. *Olcott Falls Co.,* 65 N. H. 290, 377; *Morgan* v. *King,* 35 N. Y. 454; *The Montello,* 20 Wall. 430, 441, 443; *Barney* v. *Keokuk,* 94 U. S. 324, 336; Cool. Con. Lim. 726–728. The Merrimack river was formerly used in connection with the Middlesex canal as a highway for a line of boats between Concord and Boston. Many streams are highways for logs. But while the public right of way in a flotable or navigable fresh river or small pond is, in this state, an easement in the submerged land of the riparian proprietors, the public right of flotation or navigation in large ponds and arms of the sea is one of the objects accomplished by vesting the beds of such waters in the state, in trust for public

use, as they were formerly vested in the crown. *State* v. *Gilmanton, supra; Conn. R. L. Co.* v. *Olcott Falls Co.*, 65 N. H. 290, 387–389; *Com.* v. *Roxbury*, 9 Gray 451, 479, 482, 484, 492. The purpose and nature of the trust in which the right of way in Connecticut river is held is the ground on which it was decided in the Olcott Falls case, that the right is not relinquished or discontinued by an ordinary grant of the land under and around the water way. For the same reason, the title of the soil under large ponds and tide-waters does not pass by an ordinary governmental grant of land bounded by or on them, or by a mere grant of a township or lot in which they are situated, although they may come within a municipal jurisdiction established by the same grant. *East Haven* v. *Hemingway*, 7 Conn. 186, 198–200. And the purpose and nature of the trust in which the basins of these public waters are held are such that an alienation of the title of the soil is not an exercise of executive power, and cannot be effected without legislative authority.

The acquisition of water rights by prior appropriation for manufacturing and other purposes is a new doctrine, adopted and extended where the English riparian rule has been considered inapplicable, or applicable only to a limited extent to local conditions. *Cary* v. *Daniels*, 8 Met. 466–468; *Head* v. *Am. M. Co.*, 113 U. S. 9, 24–26; Pom. Rip. Rights, s. 11; *Atchison* v. *Peterson*, 20 Wall. 507, 510, 511; *Basey* v. *Gallagher*, 20 Wall. 670, 681–683; *Jennison* v. *Kirk*, 98 U. S. 453, 457–461; *Broder* v. *Water Co.*, 101 U. S. 274, 276. "The former decisions of this court, in cases involving the right of parties to appropriate waters for mining and other purposes, have been based upon the wants of the community and the peculiar condition of things in this state." *Hoffman* v. *Stone*, 7 Cal. 47, 48.

Liberties of hunting and fishing, and other common rights, always exercised here in the wild and unoccupied districts of the public domain, and retained in large ponds and tide-waters after the adjoining dry land became private property, have been impaired in England by monarchical and feudal theories and usages, and a system of legal inequality in the enjoyment of public property, not consistent with the purposes for which this state was settled, and not adopted by its inhabitants. In every government of laws, a body of unwritten, common law is inevitable. No legislature can foresee the innumerable variety of complications in human affairs, or provide a statutory rule sufficiently precise and definite to meet each particular case. 1 Pat. Lib. Sub. 141, 143, 145. "Common law, as well as statute law, grows out of the situation and circumstances of the people." *Brown* v. *Langdon*, Smith (N. H.) 178, 182. Differences of condition produce differences of law. A great proportion of the English common law "grew into use by gradual adoption, and received from time to time the sanction of the courts of justice, without

any legislative act or interference. It was the application of the dictates of natural justice and cultivated reason to particular cases." 1 Kent Com. 471. The dictates of justice and reason, applied to the situation and circumstances of New Hampshire settlers, were in many respects materially different from the law of England. "To such a colony there is no doubt that the settlers from the mother-country carried with them such portion of its common and statute law as was applicable to their new situation." *Parke*, B., in *Kielley* v. *Carson*, 4 Moore P. C. 63, 84; *Phillips* v. *Eyre*, L. R. 6 Q. B. 1, 19. The immigrants brought, not the whole body of written and unwritten laws under which they had enjoyed rights and suffered wrongs, but only such as were suited to their condition and wants, consistent with their new state of society, and conformable to the institutions they intended to establish, and the general course of policy they intended to pursue. *State* v. *Rollins*, 8 N. H. 550, 561; *Pendergast* v. *Young*, 21 N. H. 234, 236, 237; *Cochecho R. R.* v. *Farrington*, 26 N. H. 428, 438; *Hall* v. *Martin*, 46 N. H. 337, 346; *Lisbon* v. *Lyman*, 49 N. H. 553, 569; *Cole* v. *Lake Co.*, 54 N. H. 242, 279, 283, 285, 286; *Going* v. *Emery*, 16 Pick. 107, 115; *Canal Com'rs* v. *People*, 5 Wend. 423, 463; *Williams* v. *Williams*, 8 N. Y. 525, 541; *People* v. *Canal Apprais- ers*, 33 N. Y. 461, 468, 476, 477; *Roberts* v. *Baumgarten*, 110 N. Y. 380, 383; Suth. Stat. Const., *s.* 15; Cool. Con. Lim. 34, 35.

By the English rule thus modified, the legal title of New Hamp- shire land was in the king, who held it as trustee in his official and representative capacity, with no private interest. The dry land, and the soil under fresh rivers, brooks, and small ponds, was con- vertible, by his grant, into private property, for settlement, and for the advancement of the common welfare. The sea-shore, arms of the sea, and large ponds, by reason of their special adaptation to public uses, were set apart and reserved as public waters. They could not be converted into private estate, or subjected to a private easement, by the trustee's grant, or by any act of the executive branch of the government. The distinction is between what the trustee held for public use, and what he held for the purpose of sale or other appropriation to private use for the public benefit. *Weber* v. *H. Com'rs*, 18 Wall. 57, 68. "The use of navigable waters is inalienable." 3 Kent Com. 427. "It is incompetent for the crown in modern times to abridge or destroy . . . the public rights either of navigation or fishery." Gould Wat., *ss.* 21, 32, and authorities cited in 65 N. H. 387, 388. Public and private rights have been enlarged by the gradual abolition of the king's despotic power. 4 Bl. Com. 409, 418–420. But in judicial de- cisions, the change has not been methodical or consistent. Land covered by public water is capable of many uses. Rights of navi- gation and fishery are not the whole estate. And sufficient rea- sons have not been given for regarding all but two of the rights and uses comprised in the title as the private property of a former

trustee, or convertible into private property by his grant. He "held the sea-shores as well as the land under the sea," and other property of the same public class, "for the use and benefit of all the subjects, for all useful purposes, the principal of which were navigation and the fisheries." *Com.* v. *Roxbury*, 9 Gray 451, 483; *Arnold* v. *Mundy*, 6 N. J. Law 1, 71–73, 76, 77. The true rule, applied to Sanbornton bay, made the water's edge the boundary of the proprietors of Gilmanton.

The law of public waters is presumably uniform, and on many questions it is not material whether an authority relates to tide-water or to large ponds. *Blundell* v. *Catterall*, 5 B. & Al. 268, was an action of trespass *qu. cl.* for driving bathing machines across a beach. "The plaintiff was the lord of the manor of Great Crosby, which is bounded on the west by the river Mersey, an arm of the sea. As lord of the manor, he was the owner of the shore [the land between high- and low-water mark], and had the exclusive right of fishing thereon with stake-nets. The defendant was the servant at a hotel erected   .   .   .   upon land in Great Crosby fronting the shore, and bounded by the high-water mark.   .   .   .   The proprietors " of the hotel " kept bathing machines for the use of persons resorting thither, who were driven by the defendant in machines across the shore into the sea for the purpose of bathing." The shore being a part of the plaintiff's manor, and the hotel grounds being bounded by high-water mark, the defendant contended "that by the common law of England all the king's subjects had a right not only to traverse the ocean itself in every direction, as well for commerce, trade, and intercourse, as for every other lawful purpose; but also that they had a general public right of way over the sea-shore to and from the sea,   .   .   .   as well during the recess as during the flux of the tide, for all lawful purposes, and the king could not grant the shore so as to supersede or to deprive the public of the exercise of that right;   .   .   .   that even if the public right was not so extensive, yet at all events the king's subjects had a right of bathing on the sea-shore   .   .   .   in such a way as is conformable to decency; that they had also, as incident thereto, a right to pass over the sea-shore, not merely on foot, but with horses and carriages, that is to say, with bathing machines for that purpose, whether the sea-shore belonged to the king as public property, or to any individual as being now or even immemorially private property; and that such public right could not be superseded by the king's grant of the sea-shore as private property."

It was held by a majority of the court, Holroyd, Bayley, and Abbott, that there was no public right of using the shore for bathing, and judgment was given for the plaintiff. "The question is," says *Holroyd*, J., "with regard to the shore, that is to say, the land between the high- and the low-water mark.   .   .   .   A gen-

eral public right in all the king's subjects to use the sea-shore for
all such temporary purposes as they please, would be, I think,
inconsistent with the nature of permanent private property, or
with the sea-shore becoming such permanent private property. If,
therefore, the right of bathing, and the right of passing over the
sea-shore on foot and with carriages, claimed as incident thereto,
be claimed under the supposed general right of the public to use
the sea and the shore for all such temporary legal purposes as
they may please, such a public right of general appropriation is
inconsistent with the fact of the *locus in quo* being private prop-
erty, and of the fishing therein being also a private exclusive right,
as stated in the case.   .   .   .   Where the soil remains the king's,
and where no mischief or injury is likely to arise from the enjoy-
ment or exercise of such a public right [of bathing], it is not to be
supposed that an unnecessary and injurious restraint upon the sub-
jects would, in that respect, be enforced by the king."

"By the sea-shore," says *Bayley*, J., "I understand the space
between the ordinary high- and low-water mark, and the property
in this is, *prima facie*, in the king. It may, indeed, by grant or
prescription, belong to a subject; but until the contrary is shown,
the presumption is that it belongs to the king. Many of the
king's rights are, to a certain extent, for the benefit of his subjects,
and that is the case as to the sea, in which all his subjects have
the right of navigation, and of fishing, and it is so in highways,
along which all his subjects have the right of passage, and the
king can make no modern grants in derogation of those rights.
.   .   .   The right [of bathing], as claimed, is not confined to any
particular place if it exists at all, but it must exist upon every part
of the sea-shore.   Every private building, then, erected upon the
sea-shore, and even wharves and quays, would be an obstruction to
that right, and, of consequence, abateable or indictable.   And yet,
in how many instances are such buildings, wharves, and quays
erected?   Every embankment by which land is redeemed from
the sea would obstruct the exercise of this right, and be a nuisance,
and so would the erection of stakes for holding nets ; and yet, how
frequently are such embankments made, and such stakes set up ?
.   .   .   The inconveniences which would result from" the gen-
eral common-law right claimed by the defendant, "afford to my
mind a strong argument against its existence.   .   .   .   If an
individual had the grant of the sea-shore from the crown, and were
using it for recreation or bathing, he or his family might be inter-
rupted and deprived of all privacy by the exercise of this common-
law right.   .   .   .   The king, for the public welfare, may suffer
such a right to be exercised in those parts of the shore which
remain in his hands.   .   .   .   In those places in which conven-
ience has required the right, and it has continued from the time of
legal memory, there will be a right by custom; and where that is
not the case, the crown or its grantees are not likely to withhold

it, upon proper terms, and under proper regulations." The opinion of *Abbott*, C. J., presents the same argument from the inconvenience of a right of bathing that would prevent the building of wharves and the reclamation of land from the sea, and the same suggestion that where the king is the owner of the shore it is not probable that any obstruction to bathing will be interposed on his behalf.

The effect of these opinions, and of the judgment recovered by the lord of the manor, is, that the English shore was not originally vested in the king as a mere official trustee, holding the legal title for the public use and benefit, but that he had such a private interest in it that he, or his grantees, could exclude the owners of the adjoining land from the privilege of bathing in the sea, and exact rent or tolls from all persons crossing or entering the shore for that purpose.

A different view is taken in the dissenting opinion of *Best*, J., who says,—"We have been told that lords of manors will find it their interest to indulge the public with the privilege of going on or over the sands of the sea, and that judges and juries will check the vexatious exercise of the right to exclude them. But the free access to the sea is a privilege too important to Englishmen to be left dependent on the interest or caprice of any description of persons. . . . The owner of the soil of the shore may . . . erect such buildings or other things as are necessary for the carrying on of commerce." Although a wharf on a tidal river, "in order to be useful, must be carried out beyond the high-water mark, and, whilst the tide is up, must somewhat narrow the passage of the river, yet such wharves are necessary for the loading and unloading of vessels, and the right of passage must be accommodated to the right of loading and unloading the craft that pass. The law in these, as in all other cases, limits and balances opposing rights, that they may be so enjoyed as that the exercise of one is not injurious to the other. . . .

"The universal practice in England shows the right of way over the sea-shore to be a common-law right. . . . So far from the law allowing lords of manors to restrain persons from bathing, it will give them every facility for this recreation. . . . Bathing machines were used before my time, . . . and I think the use of them is essential to the practice of bathing. Decency must prevent all females, and infirmity many men, from bathing, except from a machine. Attempts have been made to make those who use machines pay some acknowledgment to the lord of the manor where they are used: but I cannot find that any of those attempts have yet succeeded. . . . Selden, who wrote his '*Mare Clausum*' to prove that an exclusive right might be acquired in parts of the sea, admits that the sea was originally common to all, and . . . he has collected from the works of the learned of all nations . . . that the sea and its shores were common to all

men, as much so as the air that blows over them. This, I think, proves that the doctrine is reasonable, and ought to be adopted into our law, unless there is something in our particular situation to exclude it; and so far from it being the case, there never was a country, the local situation of which, and the habits and interests of the inhabitants of which, so much required such a law. . . . The right of using the shore for the purpose of fishing does not depend on any particular law applicable to fishing only, but is part of the more general right of the subjects to the sea and its shores. . . .

" My opinion is founded on these grounds. The shore of the sea is admitted to have been at one time the property of the king. From the general nature of this property, it could never be used for exclusive occupation. It was holden by the king, like the sea and the highways, for all his subjects. The soil could only be transferred, subject to this public trust; and general usage shows that the public right has been excepted out of the grant of the soil. . . . Unless I felt myself bound by an authority as strong and clear as an act of parliament, I would hold on principles of public policy, I might say public necessity, that the interruption of free access to the sea is a public nuisance. In the first ages of all countries, not only the sea and its shores, but all perennial rivers, were left open to the public use. In all countries it has been matter of just complaint, that individuals have encroached on the rights of the people. In England, our ancestors put the public rights in rivers under the safeguard of *Magna Charta*. The principle of exclusive appropriation must not be carried beyond things capable of improvement by the industry of man. If it be extended so far as to touch the right of walking over these barren sands, it will take from the people what is essential to their welfare, whilst it will give to individuals only the hateful privilege of vexing their neighbors. It has been said that lords of manors should have a right to prevent bathing, that they might hinder persons from doing it in places of public resort. Magistrates are armed with authority to bring to punishment such as bathe indecently: I would rather rely on disinterested and responsible magistrates, than on an interested and irresponsible lord of a manor."

It is said that the strip of land between the lines of high and low water, called the shore or the foreshore, may be, and commonly is, parcel of the manor adjacent. *De Jure Maris, c.* 4; Gould Wat., *s.* 21; *Clement* v. *Burns,* 43 N. H. 609, 616. In *Blundell* v. *Catterall,* the plaintiff being " the owner of the shore " " as lord of the manor," and having the constructive possession that accompanies title, maintained trespass *qu. cl.* against a driver of bathing machines. In Mason's will, New Hampshire was described and devised as " my manor of Mason Hall." Belknap Hist. N. H. (Farmer's ed.) 15, 94; 1 N. H. Prov. Papers 42, 110. One of the mistakes he " fell into was the idea of lordship, and the granting

of lands not as freeholds, but by leases subject to quit-rents. To settle a colony of tenants " here " was indeed a chimerical project. . . . The settlements began by an equal division of property among independent freemen. Lordship and vassalage were held in abhorrence." Belknap Hist. N. H. 17, 89, 90. Such authorities as *Blundell* v. *Catterall*, and *Calmady* v. *Rowe*, 6 C. B. 861, are irrelevant where there is no manorial lord. 2 Bl. Com. 90–98. No one claims to be the feudal successor of Mason. The success of the people in the Masonian controversy (55 N. H. 186, 187) did not leave the province in the condition in which it would have been if they had failed. And whatever titles and powers would have been gained by the Masonian claimant, and whatever public and private rights would have been lost by the rest of the community if he had prevailed, he would not have acquired, in public waters, a private right that was not vested in the Plymouth company under whom he claimed, or in the crown.

The private interest of the king in tide-land, and his power of conveying it to favorites to be held as a private interest, were parts of a social system which the settlers of New Hampshire considered oppressive, and from which they endeavored to escape. They " could not have been expected to encounter the many hardships that unavoidably attended their emigration to the new world, and to people the banks of its bays and rivers, if the land under the water at their very doors was liable to immediate appropriation by another as private property; and the settler upon the fast land thereby excluded from its enjoyment, and unable to take a shell-fish from its bottom, or fasten there a stake, or even bathe in its waters, without becoming a trespasser." *Martin* v. *Waddell*, 16 Pet. 367, 414. A private ownership of this wilderness, vested in the king, and a regal or executive power of conveying those reservoirs which the interests of the settlers required the government should hold for common use, would be in conflict with the general object of their migration. The mediæval rule cannot be accepted without material modification. It is not necessary to reject the theory that the legal title of public waters was in the king. The entire equitable title and beneficial interest being held and enjoyed by the public, and being capable of alienation only by an exercise of legislative power, it matters not who is trustee. But no fiduciary theory can be adopted that allows the trustee to defeat the public purpose of the trust.

*Martin* v. *Waddell*, 16 Pet. 367, 409–413, was an action of ejectment for 100 acres of the tidal bed of Raritan river and bay in New Jersey. It was held that the tide-water trust survived the grant of the province to the Duke of York. " The country mentioned in the letters-patent was held by the king in his public and regal character as the representative of the nation, and in trust for them. . . . We do not propose to meddle with the point . . . as to

the power of the king since Magna Charta to grant to a subject a portion of the soil covered by the navigable [meaning tidal] waters of the kingdom, so as to give him an immediate and exclusive right of fishery either for shell-fish or floating fish within the limits of his grant. The question is not free from doubt. . . . But from the opinions expressed . . . in the case of *Blundell* v. *Catterall*, 5 B. & Al 287, 294, 304, 309, and in the case of *Somerset* v. *Fogwell*, 5 B. & C. 883, 884, the question must be regarded as settled in England against the right of the king since Magna Charta to make such a grant. . . . When the revolution took place, the people of each state became themselves sovereign ; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use. . . . The dominion and property in navigable waters, and in the lands under them, being held by the king as a public trust, the grant to an individual of an exclusive fishery in any portion of it is so much taken from the common fund intrusted to his care for the common benefit. . . . The questions upon this charter are: . . . Whether the dominion and propriety in the navigable waters and in the soils under them, passed as a part of the prerogative rights annexed to the political powers conferred on the duke. Whether in his hands they were intended to be a trust for the common use of the new community about to be established; or private property to be parcelled out and sold to individuals, for his own benefit. . . . The estate and rights of the king passed to the duke in the same condition in which they had been held by the crown, and upon the same trusts. . . . If the word 'soils' be an appropriate word to pass lands covered with navigable water, . . . it is associated in the letters-patent with 'other royalties,' and conveyed as such. No words are used for the purpose of separating them from the *jura regalia*, and converting them into private property, to be held and enjoyed by the duke apart from and independent of the political character with which he was clothed by the same instrument. . . . It was expressly enjoined upon him, as a duty in the government he was about to establish, to make it as near as might be agreeable in their new circumstances, to the laws . . . of England ; and how could this be done if, in the charter itself, this high prerogative trust was severed from the regal authority? If the shores, and rivers. and bays, and arms of the sea, and the land under them, instead of being held as a public trust for the benefit of the whole community, to be freely used by all for navigation and fishery, as well for shell-fish as floating fish, had been converted by the charter itself into private property, to be parcelled out and sold by the duke for his own individual emolument?"

*Martin* v. *Waddell* " was not an action for disturbing the plaintiff in a right of fishery; but an action to recover possession of the soil itself. And in giving judgment for the defendant, the court necessarily decided upon the title to the soil." *Den* v. *A. J. Co.*,

15 How. 426. The reasoning which led to the conclusion that the public trust was not terminated by the legal construction of the king's grant, tends to show that this trust could not be extinguished by him. As the conversion of tide-land into private property would have been inconsistent with the duke's duty of establishing a government, as near as conveniently might be, in the new circumstances, agreeable to the laws of England, it does not appear how such a conversion could be an exercise of royal power. The grant was of a large territory containing "all the land from the west side of Connecticut to the east side of Delaware bay, . . . together with all the lands, islands, soils, rivers, harbors, mines, minerals, quarries, woods, marshes, waters, lakes, fishings, hawking, hunting, and fowling, and all other royalties, profits, commodities, and hereditaments to the said several islands, lands, and premises belonging and appertaining, with their and every of their appurtenances, and all our estate, right, title, interest, benefit, advantage, claim, and demand of, in, or to the said lands and premises, or any part or parcel thereof, and the reversion and reversions, remainder and remainders, together with the yearly and other the rents, revenues, and profits of all and singular the said premises, and of every part and parcel thereof." Poor Chart. & Con. 783, 784. The American construction of this deed being that it did not make the grantee private owner of the tidal basin of Raritan river and bay, it would seem that the grantor's ownership of American tide-land was not an interest of a private character. "All our estate, right, title, interest, benefit, advantage, claim, and demand of, in, or to the said lands and premises," is comprehensive language, and was intended to describe all the grantor's real estate in New Jersey and New York. The terms of the grant suggested no distinction between the titles of dry land and tide-land. The water's edge was not mentioned as a boundary line of rights or powers. If all the right, title, and interest of the grantor on both sides of that line included the land on one side in a sense in which it did not include the land on the other side, the result is apparently due to the nature of his title, and a difference in his conveying powers, and not to a lack of conveying words.

If the method of construction employed in *Martin* v. *Waddell* were adopted here, it would not tend to sustain private ownership upon the king's express conveyances of shores or arms of the sea, or of such fresh ponds as our law assigns to the same class of property. But the first law of public waters is the fiduciary character of the king's title; and under this law, as interpreted in this state, no construction of his grants is necessary in cases like the present. Without explicit legislative authority, he could neither discontinue a public easement of navigation or flotation in a fresh river or small pond (the bed of which could be made private property by his grant), nor alienate the bed of large ponds or tide-waters.

"The soil of the sea-shore to the extent of three miles from the beach is vested in the crown: and I am not aware of any rule of law which prevents the crown from granting to a subject that which is vested in itself." *Erle*, C. J, in *Free Fishers* v. *Gann*, 11 C. B. N. S. 387, 413. The common law of this state regards the legal title of public waters (including the soil under them) as having been vested in the king in his fiduciary capacity for the special fiduciary purpose of securing public rights; and according to the general law of trusts, this capacity and purpose gave the trustee no private right. The barren, legal title was held by him, not as a natural person, but as a corporation endowed with perpetuity (1 Bl. Com. 469), and in his public and regal character as representative of the nation who had the entire equitable and beneficial interest. This public interest, like the royal succession, would not be affected by his grant of the crown, and all rights, titles, and interests vested in him in all his capacities, public and private. The people inherited the equitable title of public waters, as he inherited the throne, by force of a common-law rule which he could not rightfully annul. At the Revolution, the state, as sovereign, succeeded the king in the office of trustee. In contemplation of law, the equitable title of the people was the same before and after the transfer of the legal title from one trustee to another. Anything less than the substance of this principle would fall short of the modification of English law required by the situation and policy of the province.

When a road was laid out under s. 2 of the act of 1719, the land damages and expense of construction and repair were a municipal burden. In a technical sense, the road was the king's highway. His ownership of the public easement was a matter of form. When the way was taken for public use by the legislative power of eminent domain, no private interest was conveyed to him. He became a mere titular proprietor. In the same ceremonial and fiduciary sense, tide-lands and large ponds were his. Provincial usage shows that these reservoirs were understood to be devoted, by natural law, to public uses. A private interest of the king in this property was a relic of a regal supremacy that is now extinct in England. The emigrants had no occasion to bring it with them. Beginning their settlement in the forest with many of the advantages of an original organization of society, exercising in town-meeting and provincial assembly substantially all the powers of local self-government, and enjoying a large measure of practical independence, they had no motive to adopt the unsound and useless doctrine of the trustee's private interest that had led, in the old country, to great abuses, some of which it had been necessary to correct by ss. 33, 47, and 48 of the great charter.

"By the law of nature every man . . . has an equal right of pursuing and taking to his own use all such creatures as are *feræ naturæ* and therefore the property of nobody. . . . The

whole island was replenished with all sorts of game in the time of the Britons; who lived in a wild and pastoral manner, without enclosing or improving their grounds, and derived much of their subsistence from the chase, which they all enjoyed in common. But when husbandry took place under the Saxon government, and lands began to be cultivated, improved, and enclosed, the beasts naturally fled into the woody and desert tracts; which were called the forests, and having never been disposed of in the first distribution of lands, were therefore held to belong to the crown. These were filled with great plenty of game, which our royal sportsmen reserved for their own diversion, on pain of a pecuniary forfeiture for such as interfered with their sovereign. But every freeholder had the full liberty of sporting upon his own territories, provided he abstained from the king's forests." This liberty of freeholders was afterwards limited to lords of manors and other privileged classes. The right of the crown "was exerted with the utmost rigor at and after the time of the Norman establishment; not only in the ancient forests, but in the new ones which the conqueror made, by laying together vast tracts of country depopulated for that purpose, and reserved solely for the king's royal diversion; in which were exercised the most horrid tyrannies and oppressions, under color of forest law, for the sake of preserving the beasts of chase: to kill any of which, within the limits of the forest, was as penal as the death of a man. . . . King John laid a total interdict upon the winged as well as the four-footed creation. . . . The cruel and insupportable hardships, which those forest laws created to the subject, occasioned our ancestors to be as jealous for their reformation as for the relaxation of the feudal rigors and the other exactions introduced by the Norman family; and accordingly we find the immunities of *carta de foresta* as warmly contended for, and extorted from the king with as much difficulty, as those of *magna carta* itself." 2 Bl. Com. 411, 414–416, 418, 419, and notes by Christian, Kerr, and Coleridge.

"Though the forest laws are now mitigated, and by degrees grown entirely obsolete, yet from this root has sprung a bastard slip, known by the name of the game law, now arrived to and wantoning in its highest vigor: . . . both productive of the same tyranny to the commons, but with this difference, that the forest laws established only one mighty hunter throughout the land, the game laws have raised a little Nimrod in every manor." 4 Bl. Com. 415, 416. An "exclusive right of fishing in a public river is also a royal franchise; and is considered as such in all countries where the feudal polity has prevailed; though the making such grants . . . was prohibited for the future by King John's great charter: and the rivers that were fenced in his time were directed to be laid open, as well as the forests to be disafforested. This opening was extended by the second and third charters of Henry III to those [rivers] also that were fenced under

Richard I; so that a franchise of " exclusive " fishery ought now to be at least as old as the reign of Henry II." 2 Bl. Com. 39.

"In the old Teutonic constitution, just as in the old Roman constitution, large tracts of land were the property of the state, the *ager publicus* of Rome, the folkland of England. As the royal power grew, as the king came to be more and more looked on as the impersonation of the nation, the land of the people came to be more and more looked on as the land of the king, and the folkland of our Old-English charters gradually changed into the *terra regis* of Domesday. Like other changes of the kind, the Norman conquest only strengthened and brought to its full effect a tendency which was already at work; but there can be no doubt that, down to the Norman conquest, the king at least went through the form of consulting his Witan, before he alienated the land of the people to become the possession of an individual— in Old-English phrase, before he turned folkland into bookland. After the Norman conquest we hear no more of the land of the people; it has become the land of the king, to be dealt with according to the king's personal pleasure. From the days of the first William to those of the third, the land which had once been the land of the people was dealt with without any reference to the will of the people. . . . Now this wrong . . . is redressed. A custom as strong as law now requires that, at the beginning of each fresh reign, the sovereign shall, not by an act of bounty, but by an act of justice, give back to the nation the land which the nation lost so long ago. The royal demesnes are now handed over to be dealt with like the other revenues of the state, to be disposed of by parliament for the public service. That is to say, the people have won back their own; the usurpation of the days of foreign rule has been swept away. We have . . . gone back to the sound principles of our forefathers; the *terra regis* of the Norman has once more become the folkland of the days of our earliest freedom. .. . . The land which, to put it in the mildest form, the king held in trust for the common service of the nation, was now again employed to its proper use." Freem. Eng. Const. (2d ed.) 139, 140, 142; May Const. Hist., *c.* 4; 1 Bl. Com. 286; Gould Wat., *ss.* 19, 21, *n.* 2. The trustee's private interest, gained by usurpation, and lost when the ancient limitations of executive power were restored, was a wrong which the New England colonists could not have intended to bring over and perpetuate. It was not adapted to their circumstances, but was at variance with the institutions they endeavored to establish, and the rights for which they were disposed to contend.

The argument that the private use of tide-waters and large ponds by abutters disproves the public title (*Blundell* v. *Catterall, supra*), is not conclusive. Like other general rules, the public title, and the king's want of capacity to convert such waters into private property, are applied with a due observance of private rights

founded on necessity and convenience, and maintained by uniform usage. The dictates of justice and reason, which retain in the government, for common use, the fee of large ponds, and the shores and arms of the sea (and in some states, large fresh rivers), have vested a reasonable private right of using this public property in the owners of the adjoining land. *Clement* v. *Burns*, 43 N. H. 609, 616–619; *Clark* v. *Peckham*, 10 R. I. 35, 38; *Thornton* v. *Grant*, 10 R. I. 477; *Potter*, J., in *P. S. Co.* v. *P. & S. Co.*, 12 R. I. 348, 356–370; *East Haven* v. *Hemingway*, 7 Conn. 186, 202, 203; *Frink* v. *Lawrence*, 20 Conn. 117, 121; *Mather* v. *Chapman*, 40 Conn. 382, 395; *Sherlock* v. *Bainbridge*, 41 Ind. 35; *Delaplaine* v. *C. R. Co.*, 42 Wis. 214; *Diedrich* v. *N. R. Co.*, 42 Wis. 248; *U. Co.* v. *Brunswick*, 31 Minn. 297; *Lincoln* v. *Davis*, 53 Mich. 375; *Dutton* v. *Strong*, 1 Black 23, 31, 32; *R. Co.* v. *Schurmeir*, 7 Wall. 272, 289; *Yates* v. *Milwaukee*, 10 Wall. 497, 504; *Weber* v. *H. Com'rs*, 18 Wall. 57, 65. This right is not bounded by low-water mark. For shipping purposes in Portsmouth, it is reasonably necessary that wharves should be built, from the upland, not only across the land uncovered at low tide, but also beyond it. In Lake Winnipesaukee, a steamboat wharf must extend to a navigable depth in the dry season. *Atlee* v. *P. Co.*, 21 Wall. 389, 393. An abutter's use of the bed of a public water, like a riparian owner's use of a fresh river flowing over his land, is governed by the rule of reasonableness applied to the facts of his case.

"By the common law, the king was the proprietor of the soil under the navigable water, and this being regarded as a private emolument of the crown, was susceptible of transfer to a subject. But such transfer did not divest or diminish, at least after *Magna Charta*, the public rights in the water, and, consequently, the grantee of the crown held the property in subjection to the common privilege of fishery and navigation. . . . The king could not deprive the subjects of the realm of these general rights. This was a power that resided in parliament." "By the rules of the ancient law, the owner of land along the shore was entitled to no right as an incident of such ownership, except the contingent ones . . . of alluvion and dereliction. . . . On the other hand, the title to the soil under tide-water was in the sovereign, and such title was attended with the usual concomitants of the ownership of realty. And it consequently followed, . . . that in order to enable the owner of the upland to fill in or wharf out below the line of high water, it was absolutely necessary to adopt some principle different from those of the common law." *Stevens* v. *P. R. R. Co.*, 34 N. J. Law 532, 550, 544. In that case it was held that by a local custom of New Jersey, abutters have an inchoate right to wharf out to low-water mark; that this right is a license, revocable before execution; and that under a statute making it lawful for them to build docks or wharves upon the shore in front of their lands, and in any other way to improve the same,

and when so built upon or improved, to appropriate the same to their own exclusive use, the license does not become irrevocable until the improvement is made. The doctrine that the soil under tide-water is a private emolument of the sovereign (subject to public rights of fishery and navigation), and that, without express or implied license, abutters cannot build wharves, or bathe in the sea, in front of their own land, is not introduced here by applying the dictates of justice and reason to the situation of the American people. The public title of the beds of large ponds (*State* v. *Gilmanton*, 9 N. H. 461), including a public right of fishery that cannot be impaired by prescription (*State* v. *Franklin Falls Co.*, 49 N. H. 240, 250, 252–257), and the private right of wharfing out (*Clement* v. *Burns*, 43 N. H. 609, 617–619), are not overthrown by such cases as *Marshall* v. *Ulleswater S. N. Co.*, 3 B. & S. 732, L. R. 7 Q. B. 166, *Bristow* v. *Cormican*, 3 App. Cas. 641, *Bloomfield* v. *Johnston*, Ir. 8 C. L. 68, and other authorities cited in *Stevens* v. *P. R. R. Co.*, 34 N. J. Law 532. If due weight is given to the axiom that common law grows out of the institutions and circumstances of the country, the conclusion is unavoidable that the rights of abutters and the public in American public waters are the whole property, and not merely what was left for the subjects of the realm by the ancient monopolies of the English executive and the manorial lords.

*Hamlin* v. *P. M. Co.*, 141 Mass. 51, 57, was an action of tort for building a wharf on the plaintiff's tide-land in Acushnet river. The defendants contended that the plaintiff had no rights in the soil below low-water mark. By a special act, passed in 1806 (108 Mass. 209), the legislature had authorized the owners of lots adjoining Acushnet river in New Bedford to erect and maintain wharves parallel with their several lots to the channel of the river. It was held that whether this did or did not give the lot-owners an unrestricted fee, it operated as a legislative grant to them of an interest in the soil between their lots and the channel, and gave them a possessory title for the purpose of building wharves, sufficient to maintain trespass. In this state, such grants are not necessary. What form of action is appropriate when the abutter has not actual possession, is a question of no practical importance. If the state has a right of action for the possession when a wharf is wrongfully built in front of his land (*Coburn* v. *Ames*, 52 Cal. 385, 398), this does not preclude his recovering a judgment that will enable him to exercise his right of wharfing out.

The proceeding at English common law to obtain leave to build a wharf or other structure on the king's tide-land was a writ of *ad quod damnum* to ascertain what injury would ensue. Upon the return of a favorable verdict, the proposed work was authorized by the king's license. Com. Dig , *Ad Quod Damnum* ; Gould Wat.. ss. 21, 43, 669. In this state, the manner in which and the extent to which the bed of a public water can be reasonably appropriated

to the exclusive use of a littoral proprietor is determinable on a bill in equity. The ascertainment, location, and measurement of his right before he attempts to exercise it may be more useful than any remedial course that can be taken after a controversy has arisen on his alleged violation of the public right. *C. R. L. Co.* v. *Olcott Falls Co.*, 65 N. H. 290, 390–392. If there were no statutes relating to chancery jurisdiction, the common law would furnish necessary and convenient procedure. *Walker* v. *Walker*, 63 N. H. 321; *Boody* v. *Watson*, 64 N. H. 162, 171, 178, 179. If it is reasonable that flats should be filled, or permanent works constructed, by abutters, and that they should not be deprived of their improvements without compensation, or that limitations or conditions should be imposed for the protection of public or private interests, a decree, made upon a hearing of all interested parties, maintains the equities of the case, and so adjusts the exercise of the public and the private right that there shall be no substantial infringement of either. Without a decree or judgment on the question of reasonable use, the abutter assumes the risk of his construction of a wharf, warehouse, weir, tide-mill, or other thing, below the water's edge, being found to be unreasonable, and his structure being an abatable nuisance. This risk has been assumed, from the earliest settlement to the present time, without fear of loss; and if any public or private wrong or inconvenience has resulted, it is not generally known. The experience of more than 250 years has shown no practical difficulty in the question of the abutters' reasonable private use, and no defect in the law calling for such amendments as have been made in Massachusetts in relation to tide-waters.

An abutter's private right of use and occupation in a public water, though conveyable by his deed of his upland (*Watson* v. *Peters*, 26 Mich. 508, *Turner* v. *Holland*, 65 Mich. 453, *Norcross* v. *Griffiths*, 65 Wis. 599, 619, 620), is a severable part of his estate. In value, it may be the chief part. The reason of the law does not forbid him to sever, and sell or lease, the right he may not wish to exercise. *Simons* v. *French*, 25 Conn. 346, 352, 353; *L. Society* v. *Halstead*, 58 Conn. 144, 150, 152; *Hanford* v. *St. P. Co.*, 43 Minn. 104; *Goodsell* v. *Lawson*, 42 Md. 348. Being a part of his estate, it cannot be taken from him for private use without his consent, or for public use without compensation. In some instances it may not be material whether the fee below the water's edge is in him subject to reasonable public use, or in the state subject to his reasonable private use. In some places the public right of use is more, in others it is less, important than the private right. Convenience requires a rule, and no serious inconvenience has arisen from the adoption of the water's edge as the boundary of public and private ownership. Whether the water's edge, which is the high-water line in tide-waters, is the low-water line in large ponds (Gould

Wat., *s.* 203, Tied. R. P., *s.* 836, *Paine* v. *Woods*, 108 Mass. 160, 170) may be a question to be considered in determining what common-law forms of action are appropriate when remedies are demanded for alleged infringements of the public or the private rights existing below the line of high water.

" Navigable water" "is here held to mean all such waters as are actually navigable, whether fresh or salt. When it is considered that the rights and interests of the public, such as fishing, ferrying, and transportation, are preserved in all navigable waters by the inherent and inalienable attributes of the sovereign, it would seem to follow that the controversies which have arisen over the nominal ownership of the soil under such waters have been magnified beyond the real interests involved. This becomes still more apparent when we consider the character and extent of the property which may in the nature of things be acquired and enjoyed in running water. *Aqua currit et debet currere.* Neither sovereign nor subject can have any greater than a usufructuary right therein." *Smith* v. *Rochester,* 92 N. Y. 463, 479, 480. In that case it was held that all conveyable rights of property in the bed of Hemlock lake in the south-western part of New York had been vested in the state of Massachusetts and its grantees.

Salt marshes and thatch beds, specially needed by owners of cattle before sufficient mowing-ground was obtained by removing the forest, have been conveyed and inherited as private property (subject to public rights), since they were divided into lots and apportioned among the early settlers. Belknap Hist. N. II., *c.* 2 (Farmer's ed., *p.* 20); Bell Hist. Exeter, 20, 30, 31, 35, 40, 42, 130, 131, 435, 437, 438, 441, 444; Acts of June 27, 1780, November 26, 1812, July 1, 1819, and January 15, 1794 (ed. of 1830, *p.* 191); Gen. Laws, *c.* 281, *s* 9; *Knowles* v. *Dow*, 20 N. H. 135, 136, 137; *Potter*, J., in *P. S. Co.* v. *P. & S. Co.*, 12 R. I. 348, 357. Whether this private property is a mere exclusive, assignable, and inheritable right to the crop of thatch, or a fee vested in persons described in the act of 1794 as " owners of salt marshes," is a question that need not now be considered. Legislation on the subject of sea-weed, rock-weed, and flats-weed shows that by usage and universal understanding other parts of the tide-land are public property. Acts of June 12, 1789, June 18, 1793, June 14, 1800, December 13, 1808, and June 21, 1814; Laws 1840, *c.* 564; Laws 1850, *cc.* 994, 1,001; Index of N. H. Laws, *p.* 335, tit. Marshes, and *p.* 496, tit. Sea-weed; Rev. St., *c* 123, *ss.* 3, 4; Gen. St., *c.* 263, *ss.* 8, 9; Gen. Laws, *c.* 281, *ss.* 10, 11. Taking from thatch grounds the weed deemed "necessary to preserve and fertilize" them, " without leave first obtained from the owner or owners thereof," is prohibited as a " damage " to the private right of the persons designated as "owners." Taking weed from the sea-shore is regulated in a manner calculated to prevent "inconveniences and disputes " among persons exercising a public right.

This distinction is a legislative recognition and confirmation of the understanding that has always prevailed in the tide-water region, where grass-producing lots in salt-water rivers and arms of the sea have been claimed and mowed under private titles derived from the towns.

The English doctrine of the king's private interest in public waters, the need of his license to authorize a reasonable private use of them by abutters, and the necessities of commerce, raised an equitable demand for an exception to the rule that private rights cannot be acquired from the crown by prescription: Gould Wat., ss. 22, 37. In this state, the law of public waters being what justice and reason require, there is no exceptional power of invading the public right by prescription. *State* v. *Franklin Falls Co.*, 49 N. H. 240; *Collins* v. *Howard*, 65 N. H. 190; *Weber* v. *H. Com'rs*, 18 Wall. 57, 68. Private rights in thatch grounds, acquired from the public proprietor, not by prescription, but by express grants of lots laid out for private use below high-water mark, have no tendency to show that they would have been acquired by a grant of upland bounded by tide-water, or by a grant of upland within the bounds of which such grounds were found. They seem to be an instance of the operation of the rule that private rights are not acquired in public waters unless an alienation of the public property is included in the terms of a grant by express words or necessary implication. *Com.* v. *Roxbury*, 9 Gray 451, 491–497. If there are exceptional cases not governed by this rule, the existence of the rule is not a matter of doubt. When a lot of salt marsh (or the right of cropping it) has been converted into private property by an express public grant made by authority shown by usage to be competent to exercise this power over the marsh, its passing by deed or devise as parcel of a distant farm of which it is in fact a part would not be an infringement of the rule.

In *Clement* v. *Burns*, 43 N. H. 609, the plaintiff, owning land adjoining the tide-water of Cochecho river, had built a wharf above and below high-water mark, and the wharf had been taken for a highway by eminent domain. The defendant, exercising the right of navigation in public water, brought mud in boats up the river to the wharf; exercising a highway right, he put the mud on the wharf, and removed it in a reasonable time to his farm; and if these had been all the facts, he would have prevailed in the suit. On other facts, judgment was ordered for the plaintiff. Manure belonging to the plaintiff had been carried by rains and tides to the shore beyond the wharf, and mixed with the soil, and with some of the defendant's mud which had been casually dropped overboard in unloading his boats. This mixture the defendant carried away and converted to his own use; and for this act the plaintiff recovered damages. The state's ownership of the shore did not authorize the defendant to appropriate to his own use

whatever property of other persons might be found there. If he had taken a boat belonging to the plaintiff, it would have been no defence that he found it on public land or public water. The mingling of the plaintiff's manure with the state's soil and the defendant's mud by natural causes and accident, raised a question of title by accretion of realty or confusion of personalty (3 Kent Com. 428, Tied. R. P., ss. 685, 686, 2 Kent Com. 360–365) which the court did not consider. It was assumed that the plaintiff continued to be the owner of the manure, and that the defendant's appropriation of it was a tort. From this assumption, it followed that the plaintiff was entitled to a remedy in some form of action. He was not the owner, and he had no possession, actual or constructive, of the ground on which the rains and tides had deposited the manure. The conclusion that he could maintain trespass *quare clausum* may have been reached by "overlooking nice technicalities" (*p.* 620), which there would have been no occasion to disregard if the land-title and legal possession had been in him, and the defendant had been a trespasser when he brought his boats to the wharf. At the present time, when the plaintiff has a legal and just cause of action, and the sufficiency of the declaration is contested, the question of remedy is disposed of by amendment, and not by disregarding the distinctions between common-law forms of action. *Cushing*, C. J., in *Carleton* v. *Cate*, 56 N. H. 130, 136; *Stebbins* v. *L. Ins. Co.*, 59 N. H. 143; *Peaslee* v. *Dudley*, 63 N. H. 220; *W. P. Co.* v. *Eaton*, 64 N. H. 234; *Tasker* v. *Lord*, 64 N. H. 279; *Morse* v. *Whitcher*, 64 N. H. 591; *Sleeper* v. *Kelley*, 65 N. H. 206.

In *Maloon* v. *White*, 57 N. H. 152, the defendants hauled sand from the sea-shore to repair highways. The plaintiff alleged, but failed to prove, that the hauling would expose his land to be overflowed and washed away. In *Clement* v. *Burns*, if any substantial injury to the plaintiff's upland, or to his private right of using the shore, had been directly or indirectly caused by the defendant's removal of the public soil, the plaintiff would have had an appropriate and adequate remedy. *Com.* v. *Tewksbury*, 11 Met. 55, 58, 59; *Doe* v. *Morrell*, Smith (N. H.) 255; 3 Kent Com. 437; Tied. R. P., ss. 618–620; Wash. Ease., 429–488. As the wharf had been taken by eminent domain, it was not necessary to try the question whether his construction and use of it was an exercise of his private right, as owner of the upland, to a reasonable, exclusive use of the public land below high-water mark. This right of reasonable use was correctly described in the decision as "an interest in the shore, . . . which interest he may vindicate by suit." The expression "subject only to the paramount right of navigation," if it means that the fee and legal possession of the shore were in the plaintiff, or that the public had no right but that of navigation, cannot be sustained.

In some respects there has been a marked difference between Massachusetts and New Hampshire law. But in both jurisdictions large ponds are withheld from private ownership for reasons that are distinctively American. "Every inhabitant that is an howseholder shall have free fishing and fowling in any great ponds, and bayes, coves, and rivers so farre as the sea ebbes and flowes within the presincts of the towne where they dwell, unlesse the free men of the same towne or the generall court have otherwise appropriated them, provided that this shall not be extended to give leave to any man to come upon others proprietie without there leave." Mass. Body of Liberties (enacted in 1641), *art.* 16, printed in 8 Mass. Hist. Coll. (3d series) 219, Mass. Colonial Laws 1660 to 1672 (ed. of 1889), *p.* 37, and 9 Gray 465. " The great purpose of the 16th article of the Body of Liberties was to declare a great principle of public right, to abolish the forest laws, the game laws, and the laws designed to secure several and exclusive fisheries, and to make them all free." *Com.* v. *Alger,* 7 Cush. 53, 68; *West Roxbury* v. *Stoddard,* 7 Allen 158, 165. In this state, free fishing and free fowling in great ponds and tide-waters have not needed the aid of a statute for the abolition of written or the declaration of unwritten law. So far as the ordinance of 1641 introduced or confirmed these liberties, it was an enactment of New Hampshire common law. The limitation to householders within the town where they dwell is not admissible in this jurisdiction, and is not in force in Massachusetts. *Lakeman* v. *Burnham,* 7 Gray 437; 9 Gray 527. The recognition of the validity of appropriations of great ponds to private persons before 1641 (*West Roxbury* v. *Stoddard,* 7 Allen 158, 165, *Berry* v. *Raddin,* 11 Allen 577, 580, 9 Gray 516, 525, 526, 528, *Watuppa R. Co.* v. *Fall River,* 154 Mass. 305, 308) is an exception not required here for any purpose of justice or convenience. The proviso excluded the construction which might be claimed to give public access to public waters across private property.

In 1647 the want of a definition of "great ponds" was supplied, and the 16th article of the Body of Liberties was amended by changing the proviso and adding new clauses. " Provided that no town shall appropriate to any particular person or persons any great pond containing more than ten acres of land, and that no man shall come upon anothers propriety without their leave otherwise than as hereafter expressed. The which clearly to determine, It is declared, That in all creeks, coves, and other places about and upon salt-water where the sea ebbs and flowes, the proprietor of the land adjoyning shall have propriety to the low-water-mark, where the sea doth not ebb above a hundred rods, and not more wheresoever it ebbs further. Provided that such proprietor shall not, by this liberty, have power to stop or hinder the passage of boates or other vessels in or through any sea, creeks, or coves to other mens houses or lands. And for great ponds lying in com-

mon, though within the bounds of some town, it shall be free for any man to fish and fowl there, and may pass and repass on foot through any mans propriety for that end, so they trespass not upon any mans corn or meddow [1641, 47]." Mass. Colonial Laws, 1660 to 1672 (ed. of 1889), 170; Mass. Anc. Ch., *c.* 63, *p.* 148; *Com.* v. *Alger,* 7 Cush. 53, 67, 68.

Under this law of 1641 and 1647 (printed, since 1660, with the date "1641, 47," and called, in some decisions, the ordinance of 1641, in others, the ordinance of 1647), "the state owns the great ponds as public property held in trust for public uses." *Watuppa R. Co.* v. *Fall River,* 147 Mass. 548, 557. "Great ponds, not appropriated before the colony ordinance of 1647 to private persons, are public property, the right of reasonably using and enjoying which, for taking ice for use or sale, as well as for fishing and fowling, boating, skating, and other lawful purposes, is common to all." *Hittinger* v. *Eames,* 121 Mass. 539, 546; *Gage* v. *Steinkrauss,* 131 Mass. 222; *Rowell* v. *Doyle,* 131 Mass. 474; *Potter* v. *Howe,* 141 Mass. 357; *People's Ice Co.* v. *Davenport,* 149 Mass. 322. "By this ordinance it was intended to devote the great ponds to public use. . . . They were not thenceforth to be appropriated to the use of any particular person or persons, but were declared to be 'lying in common.'" *West Roxbury* v. *Stoddard,* 7 Allen 158, 166. The retention of title in the government, in trust for public uses, placed great ponds and tide-waters in the same common-law class of property. *Drury* v. *Natick,* 10 Allen 169, 179; *Paine* v. *Woods,* 108 Mass. 160, 169; *Watuppa R. Co.* v. *Fall River,* 147 Mass. 548, 556.

It was formerly held that the ordinance of 1647 "was annulled with the charter by the authority of which it was made," and that the rule established by it had derived from usage the force of common law in that colony. *Storer* v. *Freeman,* 6 Mass. 435, 438. But the correctness of this view is doubted. *Com.* v. *Alger,* 7 Cush. 53, 76; 9 Gray 517. "Whether the ordinance is a part of the statutory or of the common law in the territory of the Massachusetts Colony, it is perhaps unnecessary to determine. It was never extended over Plymouth by an act of the General Court. It is, however, the law throughout the whole Commonwealth." It "has been extended to Plymouth, to Nantucket, to the county of Dukes, and to Maine, and this has been done by usage and by judicial decision." *Litchfield* v. *Scituate,* 136 Mass. 39, 46. "It is in force throughout the whole territory of this state, including those parts which were formerly the Colony of Plymouth, Nantucket, and Dukes County, and also in Maine, although none of these were under the jurisdiction of the Colony of Massachusetts Bay." *Watuppa R. Co.* v. *Fall River,* 147 Mass. 548, 556; *Com.* v. *Alger,* 7 Cush. 53, 75, 76, 79; *Weston* v. *Sampson,* 8 Cush. 347, 354; 9 Gray 523. "When the ordinance of 1647 is said to be part of the common law of Plymouth Colony, all that is meant

is, that . . . it has been extended to that territory by usage and by judicial decision." *Watuppa R. Co.* v. *Fall River*, 154 Mass. 305, 308.

In view of the early extension of Massachusetts jurisdiction to the Piscataqua, the settlement of a large portion of our territory under Massachusetts grants, the number of settlers who came from Massachusetts to all parts of this province, and the extent of Massachusetts influence upon New Hampshire law, the ordinance of 1647 could well be considered as common law by adoption here (as it is in other parts of New England), if it were in harmony with the usages and interests of the state. Belknap Hist. N. H., *cc.* 2, 17, 18; Smith (N. H.), 448, 503; *Brown* v. *Langdon*, Smith (N. H.), 178, 182, 183; Sto. Const., *s.* 81; and authorities before cited [*p.* 7]. It describes a "great pond" as one "containing more than ten acres of land." There may be no objection to this definition; and if the provision relating to tide-waters had become a part of our law, its acceptance would have tended to show that the definition of great ponds had not been rejected.

While the ordinance maintains the public title of large ponds, it converts into private property, and gives away, a great amount of tide-land. The main object of the gratuity "has always been understood to be to induce the erection of wharves for the benefit of commerce." 9 Gray 515. "The object . . . has often been declared to be the erection of wharves and similar structures, and the reclaiming of the flats." *Henry* v. *Newburyport*, 149 Mass. 582, 585. In this state, the transfer of the fee to the abutters has not been necessary to encourage improvements below high-water mark. Their common-law right of reasonable use has been sufficient for all the purposes for which the ordinance changed the common-law title. If a change of title had been needed, the premises conveyed by the ordinance would have been excessive in length and insufficient in width. Its operation was not limited to the short and comparatively few sections of the shore on which improvements had been or were likely to be made. Abutters would not be induced to build wharves at a few points in front of their land by giving other persons the rest of the shore of the sea and the Piscataqua. The gift of a wharf-lot to the abutter who built a wharf upon it would have been enough for the benefit of commerce. If such a bounty had been necessary, the ordinance would have been defective in giving no title or right of use below low-water mark. Private ownership of so much of the tide-land (not exceeding 100 rods in width) as is bare twice a day, and public ownership where vessels can come to a wharf at low tide, is not an adequate or useful adjustment of rights for commercial purposes. Where tide-land ought to be improved and occupied by the abutter, above and below low-water mark, he has a common-law right to improve and occupy it. When it is doubtful whether his proposed use and occupation of it would be reasonable, a deci-

sion of the question of reasonableness can be obtained in an appropriate action brought by him or the attorney-general.

In *Nudd* v. *Lamprey*, decided in the county of Rockingham at the December term, 1847, it was held that the provision of the Massachusetts ordinance relating to the shore of tide-waters has not been adopted and is not in force in this state; and there is no ground on which that case can be overruled. The introduction of any other line than high-water mark as the marine boundary would overturn common-law rights that had been established here, by a usage and traditional understanding of two hundred years' duration, before they were questioned in *Nudd* v. *Lamprey*. And the rejection of the whole ordinance, except the clause defining a " great pond " as one " containing more than ten acres of land," may leave little ground for the claim that this definition has become a part of our law. There would be a distinction between public and private ponds if the ordinance had not been passed, and the common-law classification can be determined and applied by common-law means and methods. Parties are entitled to judgments in which their legal rights are ascertained and established. How far the marine territory of a nation extends from high-water mark, is a question which courts may be compelled to decide on other evidence than written law. *Queen* v. *Keyn*, 2 Ex. D. 63. The decision in *State* v. *Gilmanton*, that Sanbornton bay is a large pond and a public water, was not based on the Massachusetts ordinance. However slight the argument in favor of any particular dimensions in determining whether a pond is public or private property, the law requiring a decision of the question authorizes the adoption of a necessary rule. A standard of size seems to be indispensable, and if a more satisfactory measure is not found, ponds of more than ten acres may properly be classed with Sanbornton bay.

The division of lakes and ponds into public and private classes of property is not a federal question. So far as state courts have considered the subject, they seem to agree that such a division must be made, and that Lakes Superior, Michigan, Huron, Erie, Ontario, and Champlain are public waters. This modification of what has been supposed to be the English rule seems to be put on the ground that the six largest lakes flowing into the St. Lawrence are inland seas, navigable in fact, and used for an extensive commerce. Before determining whether a lake or pond is public or private property, the law does not wait to see how much it will be used for commerce. Its commercial use may depend on the future unknown population and business of the surrounding country. A great amount of transportation would probably be introduced on Sanbornton bay by the rise of a large city at each end of it. If natural capacity for navigation were the test, some degree of capacity would have to be selected. A pond is not a public water merely because small logs can be floated through it in May or

June.   But a sufficient reason has not been given for selecting Champlain as the measure rather than Sanbornton bay or some smaller basin.   All bodies of fresh water can be connected with the sea by canals; and if a natural channel for shipping to and from the sea were required in the class of public waters, the largest American lakes would be private property.   The abandonment of the arbitrary tidal test makes it necessary to choose another; and it may be impossible to find one that is not arbitrary.   Nothing can be more arbitrary than six exceptions to the English rule. The authorities in other states tend strongly to limit the exceptions to a small number.   *Ledyard* v. *Ten Eyck*, 36 Barb. 102; *Cobb* v. *Davenport*, 32 N. J. Law 369, 377—*S. C.*, 33 N. J. Law 223; *Lembeck* v. *Nye*, 47 Ohio St. 336; *Ridgway* v. *Ludlow*, 58 Ind. 248; *Stoner* v. *Rice*, 121 Ind. 51; *Beckman* v. *Kreamer*, 43 Ill. 447; *Lincoln* v. *Davis*, 53 Mich. 375, 390; *Clute* v. *Fisher*, 65 Mich. 48; *contra*, *Trustees* v. *Schroll*, 120 Ill. 509.   In this jurisdiction, there is a different classification.

"For the purposes of this act, all natural ponds and lakes containing more than twenty acres shall be deemed public waters." Laws 1887, *c.* 86, *s.* 3.   The purposes of the act are stated in *s.* 1, which provides that "No actions shall be maintained against any person for crossing uncultivated land to reach any public water for the purpose of taking fish unless actual damage has been sustained," and in *s.* 2, which provides that "In all actions brought to recover damage for crossing land to reach any public water for the purpose of taking fish, the costs shall be limited to an amount not exceeding the damages recovered, if such damages do not exceed $13.33."   Although *s.* 1 is apparently invalid, and *s.* 2 may be contested as a discrimination inconsistent with equal rights, the act is evidence of an understanding that a pond of twenty acres is public water.   But it does not show that all smaller ponds are private property.   It was not intended to be a conveyance of public title, or an abandonment of public rights. The Massachusetts act of 1869, *c.* 384 (Mass. Pub. St., *c.* 91, *ss.* 10, 11), "changes the law in regard to the size of great ponds, in which the public may have the right of fishing," and "gives to the riparian proprietors of any pond, not more than twenty acres in extent, the exclusive control of the fisheries therein existing. . . . As the law now stands, the public have no right of fishing in any pond not more than twenty acres in extent."   *Com.* v. *Tiffany*, 119 Mass. 300, 303; *Com.* v. *Vincent*, 108 Mass. 441, 448; *Com.* v. *Perley*, 130 Mass. 469.   The statutory size seems to be expressly changed only so far as a single public use is concerned. The New Hampshire act of 1887 is much more limited.   It relates merely to actions for crossing private land to reach public water for the purpose of taking fish.

The bed of Long pond, containing in its natural condition about two hundred and sixty acres, is the property of the state.   The

water's edge is the boundary of the lot which the defendants hired, and from which they went upon the pond to get ice. Before the township was granted, the public held not only the basin of the pond, but also the bed, banks, and valley of the brook that flows from the pond to the river. In that position of the title the public owner could divert the entire pond from its outlet without infringing private rights between the pond and the river. If the original title of the valley had remained unchanged, this suit could not be maintained. But the public owner elected to convert into private property the mill site which the plaintiffs now own (situated on the brook about one hundred rods below the outlet of the pond), and to grant it to individuals from whom the plaintiffs derive their title. The Massachusetts grant of the township, recognized and established as a valid conveyance, is as effective as if made by the government of this province. The grant of the bed of the brook to private proprietors, whose title has come to the plaintiffs, conveyed rights of air, light, heat, and water. No express mention of these rights was necessary. They passed as parcel of the estate. If the original owner had desired to retain an unlimited right to divert the pond and destroy the mill privilege, there should have been an express reservation.

A right to the natural flow of the brook, not unreasonably diminished or polluted, was inherent in the land, and one of the rights of use and occupation of which the title was composed. It may have been more valuable than all the others. By an elementary rule of conveyancing, it passed from grantor to grantee, in the absence of a stipulation to the contrary. The operation of the rule did not depend upon the question whether the water was a natural pond, large or small, before it entered the plaintiffs' lot. The water-right, having passed to them from the original public owner, is a part of their mill lot in the legal and essential sense in which a right to rains, winds, electricity, and the use of them on that lot, is a part of their realty. If the legislature should authorize the governor to sell Long pond, his deed of it to the defendants would convey nothing to the plaintiffs, and would not convey to the defendants the right of unlimited use which ceased to exist when the mill privilege was converted into private property by governmental grant. If the plaintiffs have been injured by an unreasonable use of the pond, or of any other lot of land or water, there is a legal remedy. *Cary* v. *Daniels*, 8 Met. 466, 476, 480; *Com.* v. *Tewksbury*, 11 Met. 55, 57; *Com.* v. *Alger*, 7 Cush. 53, 84–87; 3 Kent Com. 439, 440; *Bassett* v. *Co.*, 43 N. H. 569, 578; *Holden* v. *Lake Co.*, 53 N. H. 552; *Thompson* v. *And. Co.*, 54 N. H. 545, 549–554; *Conn. R. L. Co.* v. *Olcott Falls Co.*, 65 N. H. 290, 391, 392. In *Watuppa R. Co.* v. *Fall River*, 147 Mass. 548, 557, 558, it was held by a majority of the court that the ordinance of 1641–'47 introduced a peculiar rule, under which, by an implied reservation in grants of land on

streams flowing from great ponds, the public owner retained a right to divert the ponds. This change of the common law has not been adopted in this state.

In exercising the public right of cutting and gathering ice, the defendants may have advantages as tenants of a littoral proprietor. Stagings and platforms, erected by them in the pond in front of their hired lot, and used in filling their ice-houses, may be claimed to be within their lessors' right of reasonable use of which wharfing out is an example. Such appliances may not harm the plaintiffs' mill privilege, but the abutters' right to take ice is not exclusive. The public may have access to the pond over a highway laid out under the general highway law, or under *c.* 97, Laws 1887, entitled "An act providing for highways to public waters." The quantity of water the defendants can rightfully divert from the brook, in a solid or liquid form, may be restricted by other persons exercising the public right at the same time, or earlier in the same season. The public character of the right does not multiply indefinitely what could be legally taken if only one person exercised the right. The quantity that can be taken by all is limited by the reasonable use which is the extent of the water-right attached to the soil, and vested in the owner of the basin through which the water flows. But for reasons suggested in *Cummings* v. *Barrett,* 10 Cush. 186, 189, 190, the removal of large quantities of ice from ponds may not always be injurious to mills on out-flowing streams. The agreed facts do not show that the defendants' removal of ice was an unreasonable use of the pond, or that the plaintiffs suffered damage. As the parties do not agree on these points, the case must stand for trial. The competency of evidence on the question of reasonable use is to be considered when evidence is offered.

*Case discharged.*

CARPENTER and BINGHAM, JJ., did not sit: the others concurred.